# EXHIBIT C

1

1              IN THE UNITED STATES DISTRICT COURT

2            IN AND FOR THE DISTRICT OF DELAWARE

3                        - - -

4   ALCATEL USA RESOURCES, INC.,    :     CIVIL ACTION
    a Delaware corporation, and     :
5   ALCATEL INTERNETWORKING, INC.,  :
    A California corporation,        :
6                                    :
                Plaintiffs           :
7                                    :
            vs.                      :
8                                    :
    FOUNDRY NETWORKS, INC.,          :
9   A Delaware corporation           :
                                     :
10              Defendant            :     NO. 05-418 (SLR)

11                       - - -

12                              Wilmington, Delaware
                                Tuedsay, August 8, 2006
13                              5:07 o'clock, p.m.

14                       - - -

15   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge

16                       - - -

17   APPEARANCES:

18          YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
            BY:  JOSY W. INGERSOLL, ESQ.
19

20                    -and-

21

22

23

24                              Valerie J. Gunning
                                Official Court Reporter
25

```
 1   APPEARANCES (Continued):

 2
            NIRO, SCAVONE, HALLER & NIRO
 3          BY:  ROBERT P. GREENSPOON, ESQ. and
                 TIMOTHY J. HALLER, ESQ.
 4               (Chicago, Illinois)

 5
                 Counsel for Plaintiff
 6

 7
            POTTER, ANDERSON & CORROON.
 8          BY:  PHILIP A. ROVNER, ESQ.

 9
                    -and-
10

11          ORRICK, HERRINGTON & SUTCLIFFE LLP
            BY:  MATTHEW H.  POPPE, ESQ.
12               (Silicon Valley, California)

13
                 Counsel for Defendant
14
                    -  -  -
15

16

17

18

19

20

21

22

23

24

25
```

1

2                          P R O C E E D I N G S

3

4               (Proceedings commenced in the courtroom,

5       beginning at 5:07 p.m.)

6

7               THE COURT:  Good afternoon, counsel.

8               I don't know how best to do this.  I was thinking

9       we should all just be sitting around a table, but empty

10      tables are hard to come by in my chambers these days, so what

11      we're trying to do is compare the claim charts provided by

12      plaintiff with the products to see whether discovery has been

13      appropriately brought to closure.  Is that correct?

14              MS. INGERSOLL:  That's correct, your Honor.

15              THE COURT:  Okay.  And just because of the

16      madness of this particular trial, it's a shame we didn't get

17      together sooner and use the parties' Elmo because it's too

18      complicated to set up our old Elmo with all this that's going

19      on.

20              MS. INGERSOLL:  Since we couldn't figure out what

21      to do about the Elmo, we just prepared little notebooks which

22      will work just as well.  If you don't want to keep them, you

23      can give them back, but at least you'll have our

24      interrogatories and claim charts.

25              THE COURT:  All right.  Well, why don't we get

1  started, then.

2             MS.  INGERSOLL:   Okay.

3             THE COURT:  And see if we can't get through this

4  fairly expeditiously.

5             MR. GREENSPOON:  Good afternoon, your Honor.

6  This is Robert Greenspoon, for the Alcatel parties.  I will

7  approach to hand up a notebook.

8             THE COURT:  Thank you.

9             MR. GREENSPOON:  Thank you (handing notebook to

10  the Court).

11            Well, the notebook sets forth just a number of

12  demonstrations, and I think I will be pointing to about one

13  or two pages out of each one of the ten tabs, and so it may

14  look like it's an inch thick, but it's going to be very quick

15  and easy to go through.

16            THE COURT:  It does look like an inch thick.

17            MR. GREENSPOON:  Right.  Well, this is a

18  discovery dispute where we, the Alcatel parties as the

19  plaintiff, have defined what we believe are the feature

20  sets that impact, implicate, each of the patents in

21  suit.  And right now in Phase 1, there are four Phase 1

22  patents.

23            And the purpose of the notebook here is to

24  demonstrate to your Honor the effort that we as the plaintiff

25  have undertaken to provide to Foundry Networks our basis for

5

1    concluding that a whole raft of model numbers contain the

2    feature sets that cause them to infringe the various ones of

3    the patents.

4            So what I would like to do is first point out to

5    you in the first tab our supplemental interrogatory answer,

6    which, based on our current information, is the best

7    repository, if you will, of all of the model numbers for

8    which we have a basis to believe infringes these various

9    patents.

10           And starting on Page 2, your Honor will find a,

11   really, a 15-page, single-spaced table which contains these

12   different columns.  We identify the model number.  We

13   identify the patent.  We identify the production number, the

14   first page of a Foundry document which we are relying on, at

15   least at this stage, for a basis to conclude infringement,

16   and then the document title, and then, of course, the date of

17   the revision of the document.

18           This was an interrogatory supplement that we

19   provided to Foundry Networks in June of this year, so

20   approximately two, two and a half months ago.

21           And this was responsive to their request, if you

22   look on the top of Page 2, that we identify all Foundry

23   products that we believe -- or that we believe contend

24   infringe the patents in suit, including which specific claims

25   are infringed by each Foundry product identified.

1      So what we do in this supplemental response is we

2  are not pretending that this is an infringement, claim,

3  comparison claim chart, but this is more the identification

4  of the product answer.  The actual claim comparison claim

5  chart, where we take the patent claims on one side of the

6  chart and we compare it to the features and the product on

7  the other side, those had already been prepared by the time

8  we served this interrogatory, this answer.

9      And, by the way, the supplemental answer, I have

10 to tell you, if your Honor will take the liberty of paging

11 through it, it's a lengthy table and, in fact, we have an

12 in-house consulting expert that assisted us with this.  Our

13 consulting expert is a Ph.D.  He has 30 years of experience

14 in the telecommunications field.  He spent three weeks doing

15 nothing but helping us fill in this chart so that we could

16 communicate to Foundry Networks the basis.

17      THE COURT:  Do you mind -- I've been in court

18 since 8:30 and my back is killing me.  Do you mind if I just

19 stand?

20      MR. GREENSPOON:  I have that privilege, so, of

21 course, your Honor, as well.

22      THE COURT:  Thank you.

23      MR. GREENSPOON:  The second tab in the book

24 actually contains the infringement claim charts that we were

25 incorporating by reference in the first tab, and I've marked

1   with a little blue tab where those start.

2          Again, these are the claim comparison claim

3   charts, where we take direct quotes from Foundry Networks

4   documents, and we show these quotes in the documents, and

5   sometimes we give our little commentary there, indicate

6   practice of the claim element indicated on the left side.

7   I'm sure your Honor has seen a million claim charts like

8   these.

9          And, again, these claim charts take up the rest

10  of the entire document.

11         And our intention here, when one reads Tab 1 and

12  reads Tab 2 in conjunction, is we're attempting to show our

13  current infringement contentions on a claim-by-claim basis

14  with what part or what feature in the products caused the

15  infringement and at the same time convey the breadth of the

16  contentions by showing the basis we have to conclude that all

17  of these model numbers contain the features identified in the

18  claim charts.

19         Those are the efforts we undertook to communicate

20  to Foundry Networks our basis for naming all those models.

21         The next tab starts my presentation on what we've

22  asked for.  What are those specific feature sets that we've

23  identified?

24         THE COURT:  But before you go on, I certainly

25  understand identifying all the products.  I guess I am not

1    sure how your claim chart relates feature sets to the claim,
2    so maybe you can explain that to me.
3              MR. GREENSPOON:  Right.  I definitely will.
4              Let me start that explanation by pointing you to
5    Tab 3.
6              THE COURT:  Oh, okay.  You're headed in that
7    direction.
8              MR. GREENSPOON:  Right.
9              THE COURT:  All right.
10             MR. GREENSPOON:  I've flagged for you Page 4 of
11   that tab.  This was a February 23rd document request that we
12   served on Foundry Networks, and on Page 4, your Honor will
13   see where we have defined the term, accused products.  And
14   we're not trying to be controversial here.  We're using
15   Foundry Networks' own verbiage for what features we've
16   identified.  And we're talking about, in Item A, port
17   authentication, conforming to 802.1X standards.
18             Let me skip to Tab D because I think I will
19   use that as an example.  VLAN broadcasts, where one or
20   more of the destination ports of the VLAN is part of a
21   trump group.
22             I'm not asking for the Court to appreciate the
23   complexities just yet, but we're identifying the features
24   that we're pointing to which give us the basis for concluding
25   infringement.  In fact, these are the features that ended up

1    being treated at length in our claim charts themselves.

2            So what we did in that giant list that we

3    prepared in Tab 1 is in each of those products, specifically

4    cited product -- not product -- I'm sorry -- document numbers

5    that you see in the third column of those tables, each one of

6    those documents will contain sufficient information for us to

7    conclude that, just to take Example D here, that that product

8    contains VLANs, and that product contains VLANs in the

9    context of what are known as trump groups.  That's just an

10   example of what we've done.

11           With the document in hand, once you see that a

12   particular product model number contains VLANs and trump

13   groups and that we've contended it infringes the '840 patent,

14   then it's a simple matter to turn to our actual infringement

15   claim chart to peruse the various theories and the deeper

16   details of our infringement contentions.

17           So we asked for discovery, document discovery and

18   interrogatory discovery on that range of feature sets.

19           Tab 4 is --

20           THE COURT:  The feature sets being what?

21           MR. GREENSPOON:  In Tab 3, those items demarcated

22   A through E.

23           THE COURT:  Oh, okay.  These are the feature

24   sets?

25           MR. GREENSPOON:  That's right.

1          THE COURT:  All right.

2          MR. GREENSPOON:  That was long ago.  That was in

3    February.  In fact, that was the very first day that document

4    discovery was permitted to be served at least for the case in

5    chief rather than the previous microdiscovery, if you will,

6    on picking the four patents for Phase 1.

7          Tab 4 is an example of Foundry's response to this

8    discovery.  Tab 4 is a supplemental document response.

9          And what I've flagged for you is Page 5, which is

10   their supplemental response to Request No. 1, and what you

11   will see here is that they are referring to a number of

12   exhibits, A through E, to demonstrate, I suppose, be

13   transparent to Alcatel about what model numbers they are

14   agreeing are fairly within the scope of discovery.  And then

15   the next blue tab within the same document is Exhibit A

16   itself.  You will see a handful of model numbers are

17   presented there.

18         Exhibit B, the same and so on, through Exhibit

19   E.

20         Well, when we received this, this was in the

21   middle of June that we received this particular supplement,

22   we thought we smelled a rat, but we weren't entirely sure,

23   because the format of this objection was to say these are the

24   items that we're voluntarily producing discovery on, rather

25   voluntarily in response to your document requests.

1       It did not contain an absolute statement, and, by
2   the way, anything beyond this list, we're not producing
3   anything.  In fact, by that point in time, whatever filters
4   they had put on the discovery process to keep documents from
5   Alcatel were incomplete filters.  By this point in time, we
6   actually had a number of documents that did relate to product
7   model designations beyond that list.

8       So we were a little bit confused.  We were under
9   the impression they were giving us full discovery.  At least
10  we weren't sure why there seemed to be gaps, and then we get
11  this objection.

12      Tab 5 is a letter that I sent to Mr. Poppe,
13  counsel for Foundry, where I'm really just raising the issue
14  about nine days after the service of those objections.  And
15  I'm telling Mr. Poppe I understand what your exhibits are,
16  and it seems to us that, based on what they're supposed to
17  represent, maybe you left off these model numbers.

18      So this could have been just an innocent mistake
19  in drafting the exhibits.  I wasn't really able to know.

20      And what I'm indicating in this Tab 5 are the
21  specific model numbers where, if we remember what we did in
22  Tab 1, the specific model numbers where we thought we had a
23  basis to say, well, this model number is also an accused
24  product under this patent, but that were omitted from the
25  exhibits in the previous tab.

1        A month passed, and if your Honor turns to Tab 6,
2   you will find Mr. Poppe's response, which is -- it's a
3   two-page, single-spaced letter, and I believe Mr. Poppe is
4   conceding some points, very few points, that perhaps we were
5   right, that there are some items that should have been
6   included, but, by and large, he's saying for the very first
7   time, and I'm quoting from the middle of the second
8   paragraph, Foundry is not required to produce documents
9   related to products as to which Alcatel has failed to
10  demonstrate that its infringement allegations are supported
11  by an initial Rule 11 analysis.
12        This is July 20th.  By July 24th, I believe, we
13  filed our e-mail request for emergency relief.
14        If your Honor moves onto the next tab, this is
15  just to close the loop on the efforts that we took.
16        Oh, and by did way, your Honor, we're about to
17  begin deposition discovery, so right now we're waiting on a
18  resolution to this dispute before we are able to actually
19  take the depositions of the Foundry personnel that we need to
20  before the mid-October discovery closed.
21        The next tab, actually, it's two tabs, 7 and 8,
22  are responses to another interrogatory where we're trying to
23  get discovery through a different angle.
24        We think we have enough to provide a basis for
25  alleging infringement as we have, but it never hurts to try

1  to get the same information by asking for it in a slightly
2  different way.

3         So what we did, if your Honor turns to
4  Interrogatory No. 27, we were specifically asking Foundry to
5  take our definition of accused products, where we're really
6  just naming feature sets, really in Foundry's own words.
7  We're not trying to put words in their mouth or trying to get
8  them to admit infringement of claim elements or anything like
9  that, and we're asking them to identify by model designation,
10  et cetera, what are the model numbers that contain these
11  feature sets.

12         If you see the response, it has been an objection
13  on Tab 8.  There is the June 15th letter that came with the
14  objections.  And there was a promise we will supplement soon,
15  an acknowledgment that these are merely objections only, and
16  that has been almost two months.  We've received no such
17  supplement.

18         So at this moment in time we're dealing with a
19  situation where we've identified a number of documents that
20  set forth the basis for our contentions.

21         We were just informed on July 20th that, even
22  though we found some documents that filtered through, we now
23  know that there has been actually a concerted effort to
24  withhold entire categories of documents that are within the
25  scope of the accused products.

1          The last tabs are -- Tab 9 is a group exhibit,

2   really, of a collection of cases.  I think I will just flip

3   to the last blue tab that I made for your Honor.  This is a

4   1990 District of Delaware decision, which says this was a

5   patent case in which there's a very, very similar dispute

6   where a defendant wanted to create his or her own definition

7   of accused products.  And the quote, the ruling in the case,

8   is on the bottom of what's Page 6 on the printout, and for

9   Foundry, it's about four cases in.  It's the --

10          THE COURT:  What is the case name?

11          MR. GREENSPOON:  Rohm & Haas company.

12          Quote, Under the principles of notice pleading

13   and liberal discovery, I regard plaintiff's interrogatories

14   and document requests as germane and proper.  Therefore,

15   defendant cannot simply claim infringement and limit

16   discovery according to its view of the case.

17          And I will note, your Honor, that that is a

18   decision from yourself from 1990.

19          So the very last tab, which is Tab 10, is a far

20   more detailed technical presentation that our consulting

21   expert helped us put together.  In the event your Honor wants

22   to go into any more detail about why we find a common thread

23   of feature sets across all these different model numbers, I

24   can go through that right now.  Okay.  I can simply leave it

25   with your Honor to peruse it.

1       THE COURT:  All right.  Thank you very much.

2       MR. GREENSPOON:  Thank you.

3       THE COURT:  Let's hear from counsel for Foundry.

4       Specifically, I'm a practical person.  What is it

5   that you find objectionable or confusing?  And let's get to

6   the bottom of this and get this resolved.

7       MR. POPPE:  Your Honor, we have approached --

8   this is Matt Poppe, with Orrick.

9       We have approached this issue from the

10  perspective that the Court indicated at the telephone hearing

11  it was interested in, which is to look at the claim

12  construction by the plaintiff and to use that as the basis

13  for forming the parameters of what discovery should be in

14  this case.

15      And there has not been formal claim construction

16  yet in this case.  Claim construction under the scheduling

17  order will be starting around the close of discovery.

18  However, what we have on a related subject is the

19  interrogatory responses from Alcatel, where they present the

20  asserted claims and the features in the Foundry products that

21  they accuse of infringement.  And those would be, I believe,

22  behind Tab 2 of the binder that Mr. Greenspoon presented to

23  you.

24      And I should note there are two patents that are

25  the subject of the discovery dispute here.  Those are the

1  '192 patent and the '840 patent.

2        The other two patents, as we understand it, are

3  directed solely towards software features, and we've produced

4  documents related to those software features regardless of

5  what product they appear in.

6        So we're not aware that there's any discovery

7  dispute related to those two patents, but for the '192 patent

8  and the '840 patent, as we understand the contentions, those

9  are directed, in large part, to hardware features of the

10 Foundry products.

11       As we've explained on multiple occasions dating

12 back to last October, Foundry has introduced many different

13 products with many different hardware architectures that

14 differ from each other in relevant and substantial ways.

15 And we've submitted a letter yesterday, your Honor, that

16 details the different architectures.

17       There are three architectures which, for

18 each architecture, there's a group of products that share

19 that particular architecture, which have been discussed

20 in the past before your Honor.  There's the Ironcore

21 architecture, which was the second phase of products

22 that Foundry introduced back in the 90's, the Jetcore

23 architecture, which was the next generation, and the

24 Terathon architecture.

25       Alcatel has presented its arguments as if those

1  three architectures apply to all of the accused Foundry

2  products, but that is not the case.

3          There is an Access Iron series of products with

4  its own architecture, an Edge Iron series of products with

5  its own architecture.  The Big Iron RX has a different

6  architecture, and Fast Iron Edge Switch, Fast Iron Edge

7  Switch X series, et cetera, et cetera.  And I've provided a

8  list of these.

9          And not only do they have a different hardware

10 architecture, but we specified that they specifically lack

11 hardware features that have been listed in these

12 interrogatory responses as being features that Alcatel is

13 relying on for their infringement claims.

14          So if I can refer your Honor to Tab 2 of

15 Alcatel's binder, you go generally toward the back.  There

16 are a series of charts, one for each patent.  Each chart

17 is numbered separately, so I can't refer your Honor -- I

18 can't refer your Honor to an overall page number, but there

19 is a seven-page chart for the '192 patent, which is one of

20 the two that we're concerned with, and specifically the first

21 three pages of this chart relates to Claim 1 of the '192

22 patent.

23          And there's information where they identify the

24 features.  There are numerous, separate elements in this

25 claim.  It requires a buffer memory.  It requires a data

1    block and outlet Selection Q Management Logic, a plurality of

2    cues, a data block selection means, and then first, second

3    and third means in addition to that.

4         And your Honor is familiar with means-plus-

5    function claims.  Those claims do not cover any products

6    that accomplishes the stated function, but you have to

7    refer to the specific structures identified in the

8    specification of the packet -- of the patent that perform

9    that function.

10        So in some instances -- well, first of all, all

11   of the evidence referred to here in this claim chart relates

12   solely to Jetcore and Ironcore.  There's no information

13   provided for any other architecture.

14        For some of these elements, there is no feature

15   identified.  So, for example, they appear to identify a

16   buffer manager as the data block and outlet selection cue

17   management logic.  But that comprises a number of other

18   structures for which they simply refer back to the buffer

19   manager, without identifying the structure in the buffer

20   manager that relates to that feature.

21        So we don't know whether other hardware

22   architectures contain those features or not, because they

23   have not been identified.

24        In addition, there is a particular feature

25   in this.  It is on Page 3 of the '192 chart, if your

1   Honor chooses to look at it at some point later, and it
2   refers to a first means for identifying a specific said cue,
3   et cetera, et cetera.  And the corresponding feature that
4   Alcatel identifies is a pair of memory devices, called
5   a CAM, which is a content addressable memory, and a PRAM.
6   I forget exactly what that stands for.
7           These memory devices are not in the other
8   hardware architectures other than the Ironcore, Jetcore and
9   Terathon, with one exception, which, in turn, does not have
10  some of the other features identified as being infringing
11  elements.
12          So we have produced documents in line with the
13  specific features that they've identified as being
14  infringing.  We have not agreed to produce documents related
15  to architecture that do not have these exhibits.
16          Mr. Greenspoon also referred you to Tab 3 of his
17  binder, which is the document requests, and specifically to
18  Page 4 of Tab 3, where Alcatel provided their definition of
19  accused products for purposes of the document production.
20  But their definition here is far, far broader than what
21  they've actually defined as being accused features in their
22  infringement charts.
23          For example, the portion of this that,
24  presumably, relates to the '192 patent, which we've been
25  discussing, is No. Or Subsection B on Page 4 of Tab 3, where

1    it says, Storage of packet contents within a buffer pool at a
2    location corresponding to a buffer number, where the buffer
3    number is assigned to the appropriate cue of the destination
4    ports.

5            That's technical lingo, but the '192 patent
6    specifically describes these features as comprising part of
7    the prior art, and that it's another component of the claims
8    that is the actually inventive feature.  Specifically, and,
9    again, it's one of the terms in the patent, but the patent
10   describes the inventive feature as being the data block and
11   outlet selection cue management logic and the features
12   thereof.

13           So for them to identify two of the many elements
14   of the claim, which are identified as being parts of the
15   prior art, and saying we have to produce anything that
16   contains those features, which, frankly, probably includes
17   any switch product made by anybody anywhere given how broad
18   these are defined, that's not how discovery is supposed to
19   work.

20           THE COURT:  Before you go any further, I feel
21   like you all are talking apples and oranges and I don't
22   understand either.

23           You have said, I think, Mr. Poppe, that the most
24   appropriate way to identify products at issue in this case is
25   by their architecture.

1       MR. POPPE:  Correct.

2       THE COURT:  Plaintiff's counsel, based on Tab 3,

3  Page 4, has basically said, no, we disagree.  We are looking

4  for certain features regardless of architecture.

5       So it would appear as though -- and I guess it's

6  my job at this point to decide which of you is the most

7  reasonable when we're talking about four patents in a case

8  presented to a jury.  See, so that's my job, I guess, at this

9  point.

10       I've at least identified the dispute?

11       MR. POPPE:  Yes.

12       THE COURT:  You are not identifying things the

13  same way.

14       MR. POPPE:  Yes.  It's the level of specificity

15  at which the hardware architecture has to be defined that

16  describes the scope of appropriate discovery.

17       The level of specificity should be what's

18  in the infringement charts.  And the support for that is,

19  first of all, a series of Rule 11 cases decided by the

20  Federal Circuit in patent cases that talk about what

21  information a plaintiff has to have for each accused

22  product, and specifically I would refer your Honor to

23  the case of Antionius versus Spalding and Evenflo Companies,

24  which is 275 F.3d, 1066, and which is cited in the case,

25  in the letter we provided.

1          THE COURT:  I can find a Federal Circuit case

2     that says just about anything.  Truly, I'm not so interested

3     in that.  I gave up writing about discovery when I became a

4     Magistrate Judge and came to this position.

5               Let's start over.

6               MR. POPPE:  Sure.

7               THE COURT:  Mr. Poppe, why don't you sit down.  I

8     am going to have a discussion with you both.

9               MR. POPPE:  Okay.

10              THE COURT:  Now, Mr. Greenspoon --

11              MR. GREENSPOON:  Yes, Judge?

12              THE COURT:  -- when you go through all the lists

13    of your -- and you don't even have to stand up.  I just want

14    to do it this way.

15              When I'm looking at all the products that you

16    listed in Tab 1, many of them are listed by these

17    architectures.  Some are not.  I see Edge Iron, I see Big

18    Iron.  I see Fast Iron.  I see -- I don't know -- some other

19    things.  There's another Iron in here, Net Iron.

20              Tell me why, when you are talking about actually

21    trying a case, why is it that you don't believe using

22    the primary architectures isn't an appropriate and the

23    most reasonable way, not that you can't do it a bunch of

24    different ways in discovery, I'm not saying you can't, but

25    in terms of managing a great deal of information that you

1    are ultimately going to have to present to eight citizens,

2    why is it that the architecture isn't the best way of doing

3    it as opposed to what you have done, which is to come up with

4    a couple of different features that may or may not be --

5    well, tell me why you've come up with features as opposed to

6    architecture.

7            MR. GREENSPOON:   In trying the case, we are

8    called upon to provide the jury evidence of the architectures

9    and the features, so we don't say that the architecture is

10   the best or the features are the best.  I think we're going

11   to be called on at trial to meet our burden of proof by

12   showing that they have, that the products have certain

13   functions, and those functions are on top of certain

14   structures.

15           We're not running away from that at all.

16   Actually, at trial, what we hope to be able to do is prepare

17   our expert witness to try representative products.

18   Hopefully, we'll get some kind of stipulation by that point

19   in time that.  Let's say if the XYZ product infringes, then

20   the ABC and the MKO also infringes.

21           So we intend to build a presentation for the jury

22   that's as simple as possible.

23           The problem with the premise in my mind is that

24   we're at the discovery stage, and what we've determined is

25   that when you identify the feature set as present in the

1  products, we also have a basis for saying that the structure
2  is there as well.

3          So I have an example, Edge Iron document, that I
4  could show your Honor.  I only have one copy of it at the
5  time.

6          The Edge Iron document is cited in our Tab 1
7  chart.  And the Edge Iron document shows for the '192 patent
8  that this product has a buffer memory and that it operates
9  with output cues.  Those are actually structures, by the way,
10 not just features.

11         So because we know that the Edge Iron product
12 line has buffers and cues, and because we know that there
13 is infringement by every other Foundry product that we've
14 seen that has buffers and cues, we conclude there's a
15 basis for saying that this one does, too.  We want all the
16 discovery that's relevant to allow us to prove our case to a
17 jury.

18         The same document, different patent, the '840
19 patent.  This particular document that I'm holding shows that
20 this Edge Iron -- actually, it's a set of five different
21 model numbers, contains VLANs and it contains trump groups.
22 These are sort of a blend of structure and function, as I'm
23 presenting it right now to your Honor.

24         Because we see that they present, that this
25 product line -- we're concluding there's a basis to say that

1    it infringes the '840 patent because every other Foundry

2    product that we have more detailed information about is

3    consistent with infringement of the '840 patent for the same

4    reasons.

5              THE COURT:  And the specific discovery you're

6    looking for is just all the information there is about all of

7    the products that you've listed in Tab 1?

8              MR. GREENSPOON:  That's probably overstating it.

9    We don't want to be flooded by information any more than

10   they want to produce too much information.  We want

11   representative -- well, it's hard to say what I want because

12   I don't know exactly what is being withheld from me.  I

13   definitely want documentation which informs us in Foundry's

14   own documents of the complete structure, function and

15   operation of all of these products that they've so far not

16   given us that information.

17              It could be in in principle, it could be a

18   thousand more pages that would get this job done.  I do

19   not know that.  In principle, it could be 50,000 more pages

20   that would give us the complete document production that we

21   need.

22              That's information that's only in the hands of

23   Mr. Poppe.

24              THE COURT:  All right.  Mr. Poppe, back to you

25   again.

1          MR. POPPE:  Sure.

2          THE COURT:  And Foundry's objection is that --

3          MR. POPPE:  Foundry's objection is that Alcatel,

4    based on a conclusion that certain limited product groups

5    infringe, is arbitrarilty attempting to broaden that

6    conclusion to other products for which it has performed no

7    infringement analysis.

8          And, your Honor, Alcatel has to date demanded

9    all technical documents related to that entire 14-page,

10   single-spaced list of products that Mr. Greenspoon discussed

11   with your Honor under Tab 1 of his binder.

12         So to say now that they are asking for a limited

13   set of documents is incorrect, but we would object even to

14   producing a limited set, because document discovery is only

15   fair to the extent it relates to documents as to which the

16   plaintiff has formed some initial reasonable basis to believe

17   in infringement.

18         And for Mr. Greenspoon to say, as he did, that

19   because, for example, the Edge Iron product has a buffer

20   memory and cues, it must, therefore, infringe, as I noted to

21   your Honor earlier, the patent in question specifically

22   refers to the fact that prior art technology has included

23   buffer memories and cues.  So identifying those two features

24   is no indication after infringement.

25         They're essentially inherent features of a switch

1  product.  So what we're asking is that if Alcatel is, indeed,

2  contending that additional products outside of the three

3  Ironcore, Jetcore and Terathon architectures infringe, before

4  engaging in discovery for those other products and other

5  architectures, they should identify in an infringement chart

6  what the basis is for believing in infringement and showing

7  that they have a reasonable belief in infringement.

8          THE COURT:  And -- like which came first, the

9  chicken or the egg here.

10         MR. GREENSPOON:  Judge, I was about to say the

11  very same thing.

12         THE COURT:  So if I'm looking at Tab 4 and the

13  exhibits attached to Tab 4, these are the products to which

14  Foundry has provided information.  Is that correct?

15         MR. POPPE:  That is correct, your Honor.  There

16  are probably one or two additional products.

17         Mr. Greenspoon noted that in our subsequent

18  letter exchange, he identified a few additional products as

19  to which we had already produced documents and we will

20  supplement to indicate those.  But the products that we will

21  supplement to indicate are simply additional, I believe in

22  all cases, Terathon products.

23         So, yes, these lists, these lists are the

24  documents as to which Foundry has produced documents.

25         THE COURT:  And I don't suppose anyone thought it

1    was helpful to go through this huge list in Tab 1 and

2    highlight it for me, which of these products Alcatel is still

3    waiting for discovery, and then what I would ask --

4            MR. GREENSPOON:  Judge, I'm sorry.  I never

5    interrupt, but that's Tab 3.

6            THE COURT:  That's Tab 3?

7            MR. GREENSPOON:  I'm sorry.

8            MS. INGERSOLL:  No.  Five.

9            THE COURT:  Which is it?  Tab 5?

10           MR. GREENSPOON:  Five.

11           MR. HALLER:  Sorry.

12           MR. GREENSPOON:  Five.

13           THE COURT:  So why am I seeing Big Iron and Edge

14   Iron?  I thought all of those architectures had been --

15           MR. POPPE:  The names such as Big Iron, Fast

16   Iron, Net Iron and Server Iron are generic names that have

17   been given over time to products with different core

18   architectures.  But, for example, the Big Iron RX has

19   completely different chips, computer chips in it than the

20   ones that are in Jetcore, Ironcore and Terathon.

21           In some cases, components of it aren't even

22   made by the same companies as the ones that are in the Big

23   Iron -- I'm sorry -- in the Jetcore and Ironcore.  So that's

24   why the discussion has been primarily in terms of

25   architectures rather than the generic Big Iron or Net Iron

1  names.

2          MR. GREENSPOON:  Judge, if I may, the chip sets

3  are not the discovery question before your Honor.  At the end

4  of the day, maybe in summary judgment practice or at trial,

5  the chip sets may impact things, but at this point we've

6  identified our basis for concluding that these additional

7  model numbers contain the infringing features.

8          If the chip sets are so different that they

9  completely negate infringement even under our Alcatel's claim

10 interpretation, we're open-minded.  We'd love to see the

11 discovery.  If we conclude that as well, we'll walk away from

12 that.  But we have every inference.  We have every basis for

13 concluding that a Big Iron XYZ has the same hardware

14 structure as a Big Iron ABC.

15         THE COURT:  So, Mr. Greenspoon, what you are

16 saying is that all of the products you've listed in Tab 5

17 have each of the elements of your definition of the accused

18 products and that you have proof of that?  In other words,

19 you satisfy your Rule 11 obligation.  Is that right?

20         MR. GREENSPOON:  That's right.  And we always

21 want more information.  We will need more information,

22 because we're not satisfied that we have enough documentation

23 to do our best job in front of a jury that we ought to be

24 doing.

25         MR. POPPE:  And, your Honor, if I may?

1        THE COURT:  Yes, you may.

2        MR. POPPE:  If Alcatel had that proof for each

3   product, for each element, then my question is:  Why was that

4   not identified in response to our interrogatories served

5   months ago that asked for that specific information?  And as

6   I noted to your Honor, certain of those specific hardware

7   features that they identified as being necessary to their

8   infringement analysis are not contained in the other

9   architectures.

10        So I don't understand what their basis is for

11  making that statement, and if they believe that they can meet

12  that obligation, then they should be required, as your Honor

13  ordered with the Terathon products, to provide an

14  infringement chart.

15        THE COURT:  Well, when you say an infringement

16  chart, I mean, I have to say, with all the patent cases I

17  have had, and I've had a few, I've never been faced, I

18  can't recall that I've been faced with this particular

19  dilemma, where the plaintiff is being asked to come

20  forward with proof of infringement in order to justify

21  discovery.  And I think that's basically what you are

22  asking the plaintiff to do?

23        I mean, I'm all for being reasonable and I am

24  not confident the plaintiff is being reasonable.  You also,

25  if you know me at all, know that what I will try to do is

1    find a middle ground here because I'm not confident either

2    party is being particularly reasonable when it comes to going

3    forward here.  But I'm not quite sure how to find the middle

4    ground.

5            I mean, the claim chart to me refers to certain

6    documents, but, clearly, not to every document supporting

7    every product, which I assume is what you are really looking

8    for, Mr. Poppe.

9            MR. POPPE:  That's correct.  The information they

10   provided is for a small subset of products, and since before

11   alleging that something is an accused product, they have to

12   have a factual basis for making the allegation in the first

13   place.  That's why we're saying they should come forward with

14   the information that they have to see if it's reasonable to

15   then jump to the conclusion that these should be accused

16   products and further discovery should be permitted.  It's an

17   obligation that they are required to fulfill before

18   proceeding with these allegations.

19           THE COURT:  Well, I've certainly never seen

20   anyone do that.

21           So let's take baby steps, which I'm very fond

22   of.

23           Mr. Greenspoon, what I'm going to ask you to do

24   is to, from these exhibits, Exhibits A, B C, D and E, kind of

25   prioritize and tell me which -- give me two of the product

1 groups under those exhibits that are most important to in

2 your case.   I guess we're going to do it one of two ways:

3 I'm either going to say, if you want all of these products,

4 then you do need to go through each product and refer to at

5 least a document that identifies the basis.  One product, one

6 document, or what?

7          The other option, I suppose, is to have you pick

8 one group of products and we'll limit your discovery to

9 that.

10          I don't know which is the fairest and which makes

11 the most sense.  Let's hear from Mr. Poppe before I start

12 doing anything else.

13          I mean, is it the number at this point?  Is there

14 some --

15          MR. POPPE:  Part of it, your Honor, is the

16 number, and part of it is the principle that products as to

17 which the plaintiff cannot establish any basis for believing

18 infringement should not proceed.

19          Between the two options that your Honor stated,

20 we obviously prefer the first, and when your Honor referred

21 to identifying a document, I don't want to say I assume

22 something, but I think inherent in that should be that they

23 should identify where in the document the different elements

24 of the claim are identified so that we're not simply

25 presented with a citation to a 150-page document and told

1    that --

2              THE COURT:  Mr. Poppe, I don't know where you

3    practice, but I have never seen a claim chart that is that

4    detailed at this stage of the game.  I don't even see that by

5    the time people get to trial.

6              I applaud your efforts for doing things by the

7    book, but I've never seen it in practice.  If you have -- I

8    mean, if you have seen one, I would like to see it and then I

9    might hold the plaintiff up to that kind of standard.  I just

10   simply don't think that that is -- I just have never seen

11   anyone voluntarily do it.  I've never seen anyone who has

12   been required to do it.

13             And, again, I'm always for learning something, so

14   if you have a claim chart where every product is identified

15   to that extent, I would be happy to see it.

16             So I am not confident that makes any sense.  What

17   we're talking about is a good-faith belief and some basis for

18   understanding that a product, in fact, infringes.

19             Now, so I'm not sure where the middle ground

20   is, but I am going to look for one, because I'm not going

21   to ask the defendant to produce all the documents for all

22   this product, I'm simply not going to.  I'm not satisfied

23   that I see enough of a basis to have a comfort level in

24   that.

25             If there is a group of documents, a group

1    of products or some way to organize this where the

2    most important products to you we do get information for,

3    I am happy to do that and then we're going to call it a

4    day.

5            MR. GREENSPOON:  Judge, Tab 1 is our one

6    model, one document list that has already been provided.

7    The lengthier interrogatory answer which identifies

8    Foundry Networks document production numbers as our

9    basis for understanding the specific model numbers are

10   infringing.

11           As for prioritizing, I would love to do

12   that, but part of the impasse has been that because there

13   is this debate about what's properly in the case, we've

14   also not received adequate financial discovery from the

15   other side.  That is sort of a follow-on issue.  You know,

16   once we lock in what is fairly within the case, then we

17   can have a common dialogue about what's fair play for

18   the financial discovery.  Obviously, that impacts how we

19   could prioritize.

20           As far as reaching a middle ground, I think I do

21   have a suggestion.  I think that we can put together one very

22   targeted document request for each of the patents.  That is

23   one request per patent.  And we've already done this, but I'm

24   willing to start over again, where we ask them to provide --

25   first of all, they have to answer Interrogatory 27, where we

1  can find out what is the universe of model numbers that

2  contain the feature set that we flag as a red flag as

3  potential infringments.  And then at that point, within

4  those, within that list of model numbers, then they can

5  provide us a targeted response, a targeted document response

6  with regard to each model number.

7         And just for some context, I'm displaying to

8  your Honor the cover page of some release notes related

9  to the Edge Iron.  You'll notice, and this is another

10  thing that shouldn't escape your Honor.  The 24GS, 48GS

11  and three other model numbers, they all are described in

12  one document.  So when we show you 15 single-spaced

13  pages of model numbers, sometimes the model number

14  itself is duplicated because we're talking about

15  four or five different patents.  But in other instances

16  we have release notes or similar types of documents

17  which indicate that they really are the same and these

18  number and letter designations really reflect some

19  enhancements or customization for certain applications,

20  but it does not really impact the core feature set or

21  architectures.

22         So just, again, to summarize, if they answer

23  Interrogatory 27, give us the universe of items that have

24  these feature sets, then we'll come back and we will try

25  to get that.  We'll give them a targeted document request

1  that will help us with gathering our proof for the jury
2  trial.
3          THE COURT:  And the feature sets you're talking
4  about, is there any product that has all five of these
5  things?
6          MR. GREENSPOON:  No, no, actually.  The three --
7  three of those, I think it's A, B -- I don't recall.
8          Three of them refer to feature sets implicated
9  by three separate patents.  Two of them are implicated
10  separately under one patent.  Unfortunately, I wish it were
11  simpler and I could line them up one to one, but I can't.
12  So --
13          THE COURT:  Well, but what you are saying
14  is that there might be a product that has one feature for
15  one patent, another feature from another patent.  And
16  you're asking them to provide information about products
17  that really are not relevant to this case?  I mean, is
18  that --
19          MR. GREENSPOON:  I'm really not following.
20          THE COURT:  I mean, in my mind, what you are
21  saying is that, when I'm looking at Tab 3, Page 4, and those
22  five things are your feature sets?
23          MR. GREENSPOON:  Each individually is one
24  feature set that implicates a patent.  So, for example,
25  Item A.

1          THE COURT:  So if you've got a product that
2    has all the feature -- I don't know whether it's three
3    features or one feature listed in A, port authentication
4    conforming, et cetera, then that infringes at least one
5    claim of one patent?  That limitation or feature comprises
6    a limitation?
7          I'm just trying to understand.  I don't quite
8    understand how feature sets translates into claims.
9          MR. GREENSPOON:  That's actually very simple.
10   Port authentication conforming to 802.1X standards leads
11   us to believe that that product infringes the '890 patent.
12          THE COURT:  How?
13          MR. GREENSPOON:  Because in the -- in that
14   standard, there are certain elements of the standard that
15   many, but not all, compliant devices will practice.  That
16   particular patent, there's something called a client.
17   There's something called authenticator.  There's something
18   called a supplement.  This is also how it's termed in the
19   Foundry documents.
20          When that client, that authenticator and that
21   supplement are used in a particular way, as we have found
22   many, if not most commercial deployments or commercial
23   implemetations do --
24          THE COURT:  But I thought you said we weren't
25   concerned -- which patent is that?

38

1          MR. GREENSPOON:  '090.

2          THE COURT:  I thought we weren't concerned about

3     the '090 patent.

4          MR. GREENSPOON:  That was Mr. Poppe and I don't

5     understand where he's coming from.

6          THE COURT:  All right.  Which of these feature

7     sets are specifically related to the '840 and '192?

8          MR. GREENSPOON:  Item B relates to the '192.

9     Items C and D relate to the '840.

10          THE COURT:  And with respect to the '840, do the

11     products need to have both of these features to be

12     implicated?

13          MR. GREENSPOON:  No.

14          THE COURT:  Or they can have one or the other or

15     both?

16          MR. GREENSPOON:  Yes.

17          THE COURT:  To possibly infringe at least one

18     claim of the '840?

19          MR. GREENSPOON:  Yes.

20          THE COURT:  All right.  So we're not looking at

21     A.  We're not looking at E.  We're looking at Feature Set B,

22     C and D.  Is that correct?

23          MR. GREENSPOON:  Mr. Poppe is saying that we

24     don't have a dispute on A and E, but I have that list in Tab

25     5 where I'm not sure I've gotten discovery on the model

1   numbers related to those features.  I'm willing to talk off

2   line with Mr. Poppe to make sure that we're seeing eye to eye

3   on this.

4           THE COURT:  Now, which of these, in your letter,

5   which of those relate to Features A and E?  I mean, I don't

6   know how these exhibits are -- that's Exhibit A relates to

7   Feature A?  Is that how it's organized?

8           MR. GREENSPOON:  Unfortunately, no.  Actually,

9   no.

10          Exhibit A relates to what we're putting in Item

11  B.  Exhibit B relates to what we're putting under our

12  definition, Item A.

13          So, in other words, if you look at my --

14          THE COURT:  Keep going.  I understand.

15          MR. GREENSPOON:  Yes.

16          THE COURT:  Exhibit C relates to --

17          MR. GREENSPOON:  Exhibit C relates to -- I'm

18  sorry.  Item C in the -- under the accused products

19  definition relates to Exhibit E.  Item D in the accused

20  products definition relates to Exhibit C.  And Item E in the

21  accused products definition relates to Exhibit D.

22          THE COURT:  I am confused.

23          MR. GREENSPOON:  I --

24          THE COURT:  I'm looking at Tab 5.  Exhibit A

25  relates to Feature Set B?

1                    MR. GREENSPOON:  That's correct.

2                    THE COURT:  Exhibit B relates to Feature Set A?

3                    MR. GREENSPOON:  Correct.

4                    THE COURT:  Exhibit C relates to Feature Set --

5                    MR. GREENSPOON:  D, your Honor.

6                    THE COURT:  E?

7                    MR. GREENSPOON:  D as in dog.

8                    THE COURT:  D.  Exhibit D relates to Feature Set

9     E?

10                   MR. GREENSPOON:  D relates to Feature Set E.

11                   THE COURT:  And Exhibit E relates to Feature Set

12    C?

13                   MR. GREENSPOON:  C.

14                   THE COURT:  And Mr. Poppe, anyway, thinks we

15    should not be having any disputes about Feature Sets A and

16    E.

17                   MR. POPPE:  That's correct.  To the extent we

18    confirm any Foundry sets contains these features, we'll be

19    producing relevant documents related to those features and

20    those products.

21                   THE COURT:  Now, why is it that that is okay?  In

22    other words, the claim construction chart is sufficient to

23    satisfy you with respect to those feature sets and those

24    products, but the others are not?

25                   MR. POPPE:  Because the allegations with respect

1  to those feature sets relate to software that is relatively

2  uniform across the products whereas the hardware features

3  differ from product to product.  And so our concern is that

4  the way that the feature sets are described in this document

5  behind Tab 3 is far, far too overbroad and that the feature

6  sets should be defined by what's listed in the infringement

7  charts.

8         So we have no problem identifying ands producing

9  documents related to products that have the specific features

10 identified in those infringement charts, and that's how we

11 think what the parameters on discovery should be.

12         THE COURT:  So we're back to the beginning.  All

13 right.

14         Well, I will give you just a minute each to give

15 me -- I wanted to get this resolved, but I need to sit down

16 and look at this.  Unfortunately, that means you're stuck

17 with whatever I come to unless you all agree to something

18 before this.  You know, we're back to talking apples and

19 oranges again.

20         The claims of the '840 and the '192 are -- are

21 method claims, product claims?  What are they?

22         MR. GREENSPOON:  I believe in both case they're

23 system claims or apparatus claims.

24         MR. POPPE:  Apparatus claims.

25         THE COURT:  All right.  So we are talking

1   about -- and, Mr. Greenspoon, just before I close for the

2   day, you believe that by identifying the document under

3   Tab 1, for each of these exhibits, that that is a sufficient

4   basis for believing that the product you've identified is

5   implicated by one -- contains the feature sets that would

6   demonstrate infringement or at least a good-faith basis for

7   claiming infringement?

8           MR. GREENSPOON:  Yes.

9           THE COURT:  So maybe what I need to do is, for

10  the disputed products I will let each of you pick ten

11  products with the documents that you've identified and I will

12  see which side has a better -- well, if, in fact, that's a

13  good-faith basis, then I guess I need to find out what that

14  is as opposed to the claim chart, which is not particularly

15  helpful to me.  And if I feel as though the documents

16  identified really have nothing to do with the feature sets or

17  the claim set, then, obviously, I will not allow the

18  discovery.

19          I would look at them all, but I'm not confident I

20  have time to.  But if you believe that's a better way of

21  doing it, I'm happy to do that as well.

22          MR. GREENSPOON:  Judge, just let me plant the

23  seed one more time in your mind, that there is going to be a

24  chicken and the egg issue, because I will concede right here,

25  right now, I do not have complete discovery of all the

43

1    hardware that I would like to present to the jury to prove my

2    case at trial.

3            THE COURT:  Well, I know you can't prove

4    infringement, but all I am looking for is a good-faith basis

5    for that.  You should have something.

6            MR. GREENSPOON:  Absolutely.

7            THE COURT:  And if you don't, then you shouldn't

8    have discovery, and if you do, you should.

9            So I am happy to look at a representative

10   sample.  I am willing to look at all of them.  Obviously, if

11   you can work this out in the meantime, that is fine.

12   Otherwise, you need to get that to me and I will try to get

13   back to you.  All right?

14           MR. POPPE:  Your Honor, I think that's a fair way

15   to proceed, and I would suggest perhaps that each side pick

16   ten products.  It can present something to you and then each

17   side can respond to the other ten products that we pick

18   according to a schedule that we can either set now or work

19   out afterwards.

20           MR. GREENSPOON:  We can work off line with

21   Mr. Poppe and figure out a way, perhaps even in one joint

22   binder, so that you don't have to be fumbling for different

23   presentations.

24           But before we leave, though, your Honor, it would

25   help us immensely if Foundry were just -- if your Honor were

1  to simply suggest to Foundry that it would be a good idea to

2  answer Interrogatory No. 27.  That's the interrogatory where

3  we've asked them to -- from their own records, from their own

4  knowledge, which is always going to be superior to our

5  knowledge, tell us what the model numbers are that do contain

6  the features, because we -- you know, we put our internal

7  expert through the three-week effort to go through their

8  document production, to try to accomplish the same thing.

9  But it would be really helpful if they would be instructed to

10 finally answer that interrogatory.

11         THE COURT:  And I take it it hasn't been answered

12 because they feel as though they're doing your homework for

13 you?  I mean, I don't know.

14         MR. POPPE:  The scope of the response to that

15 interrogatory will depend largely on the result, or on the

16 result of this particular dispute because, again, the scope

17 of the feature that they're asking for, again, we can, you

18 know, identify everything that has a buffer memory, but

19 that's not going to help narrow the scope of the products

20 that are actually reasonably in dispute about infringement

21 because the feature sets are defined so broadly with what

22 they've asked for.

23         MR. GREENSPOON:  I don't know if I'm the chicken

24 or the egg or he's the chicken or he's the egg, but at some

25 point, somebody has to show their cards.

1          We think we've shown our cards as best we can
2    right now, and what we are talking about is simply a list of
3    model numbers that they will acknowledge contain features
4    that they have to acknowledge that certain other model
5    numbers already contain.  We're not asking them to make
6    admissions.
7          THE COURT:  All right.  Well, I will keep that
8    under consideration, and you should also -- well, if you all
9    can't reach a compromise on this, then, again, I will make
10   the decision.
11         All right.  Thank you very much, counsel.  I
12   appreciate it.
13              (Counsel respond, "Thank you, your Honor.")
14              (Court recessed at 6:10 p.m.)
15                    - - -
16
17
18
19
20
21
22
23
24
25