# EXHIBIT C

2/14/97 Revision

# OEM AGREEMENT

This OEM Agreement is made effective February 14, 1997 ("Effective Date") by and between Check Point Software Technologies Ltd. ("Check Point"), an Israeli company having its principal executive offices at Diamond Tower, 3A Jabotinsky Street, Ramat-Gan 52520, Israel and Xylan Corporation ("Xylan"), a California corporation having its principal executive offices at 26679 West Agoura Road, Calabasas, CA 91302.

In consideration of their mutual representations, promises and obligations, the parties agree as follows:

1.    Development and Ownership of Software and Documentation

(a)    Check Point shall provide and license to Xylan certain software as more fully described and defined in Exhibit A ("Check Point Software") for integration into certain inter-networking products more fully described in Exhibit A ("Xylan Products"). Xylan and Check Point have determined that modifications need to be made to the Check Point Software so that the Check Point Software can be integrated into the Xylan Products.

(b)    Check Point shall use its best commercial efforts to modify the Enterprise Management Console and the Authentication Management Console (collectively, "Management Consoles") of the Check Point Software in accordance with the specifications in Exhibit B ("Statement of Work") and in compliance with the schedules specified in Exhibit B so that the Check Point Software will operate with the features, functions and specifications described in the Statement of Work.

(c)    Check Point agrees to provide the source code for the generally available Inspection Module and the Authentication Module (collectively, "Modules") of the Check Point Software to Xylan to enable Xylan to incorporate the Modules into the Xylan Products. Check Point shall further use its best commercial efforts to define and thereafter to make available to Xylan an API ("Authentication Library API") that is defined to allow VLAN Authentication through use of a Check Point developed agent and protocol (the "Authentication Library"). During the term of this Agreement, Xylan agrees to modify all current and future versions of the Xylan Products so that the Xylan Products have the capability to use the Authentication Library API to perform VLAN Authentication. The parties acknowledge that Check Point shall provide the source code to the Modules solely for the purpose of enabling Xylan to perform the modifications necessary to incorporate the Modules into the Xylan Products as contemplated by this Agreement, and that such source code provided to Xylan is and shall be the proprietary and confidential information of Check Point, subject to the confidentiality obligations set forth in this Agreement. After modification of the Inspection Module and Authentication Module, the Modules shall be the "Modified Inspection Module" and the "Modified Authentication Module," respectively and, "Modified Modules," collectively. Xylan must obtain prior approval from Check Point before making any modifications to the Authentication Library API, which approval shall not unreasonably be withheld. The parties

GDSVF&H\28068.1

Confidential Technical Material

SR01569

Xylan Legal
Contract No. 97-0035

acknowledge that Check Point has provided the source code to the Modules to Xylan prior to December 1, 1996. Upon completion of such modifications, Xylan shall provide Check Point with a copy of the source code for the Modified Modules.

(d)     "Xylan End User" refers to an end user to whom Xylan or a Xylan Partner (as defined below) distributes a Xylan Product. Xylan agrees that it shall only provide the binary, machine-readable, executable code of the Modified Modules to Xylan End Users. For management of the Modified Authentication Module, a Xylan End User must purchase the Authentication Management Console or the Enterprise Management Console as more fully described in Section 8. For the Modified Inspection Module to work, a Xylan End User must purchase an Enterprise Management Console. The Xylan End User must also obtain a license key to activate the Modified Modules pursuant to the procedures set forth in Section 8 below.

(e)     Upon execution of this Agreement, Check Point agrees to assign, if either party reasonably determines it is necessary, and provided Check Point receives notice of such needs at least 14 days in advance: (i) the equivalent of up to one engineer, to consult with and assist Xylan in its efforts to incorporate the Modified Modules into the Xylan Products and other technical aspects of the Check Point Software, and (ii) the equivalent of up to one engineer to perform the changes in the Management Consoles. Each party agrees to provide consultation, technical cooperation and other assistance as reasonably requested by the other party. Each party shall have a designated primary product manager point of contact.

(f)     Upon completion of the modifications to the Check Point Software, Xylan and Check Point shall perform the quality control and acceptance tests described in Exhibit C ("Acceptance Tests") and the parties shall endeavor to demonstrate that the Check Point Software and the Xylan Products, as modified, substantially operate and perform in all material respects in accordance with the specifications and the Statement of Work. If either party reasonably determines that the Check Point Software or the Xylan Products, as modified, has substantially failed to complete the Acceptance Tests satisfactorily, that party shall provide any information necessary to allow the other party to reproduce such non-conformities and the parties shall use their best commercial efforts to correct any defects and complete any uncompleted portion of the Development Effort so that the Check Point Software or the Xylan Product, as modified, substantially operates and performs in accordance with the Specifications. The parties acknowledge that by its nature no software is error-free or free from interruption in operation because of "bugs" or defects, including, without limitation, the Check Point Software.

(g)     During the term of this Agreement, Xylan may propose to incorporate into the Xylan Products (i) updates and new releases of the generally available Inspection Module which contain new functionality or features, and (ii) new features or functions that work in conjunction with the Inspection Module, such as connection control and encryption. Check Point shall evaluate such proposals and determine in good faith whether, in the case of (i), such incorporation is feasible or, in the case of (ii), such incorporation is technically feasible and commercially advantageous. If Check Point determines that such incorporation is feasible or technically feasible and commercially advantageous (depending on which standard applies), the parties shall negotiate in good faith the licensing and distribution fees to be paid to Check Point

2

GDSVF&H\28068.1

Confidential Technical Material

SR01570

for such new functionality or feature. Upon determination of such licenses and fees, Check Point shall provide Xylan, unless Check Point reasonably determines it is unnecessary, with the source code for the new functionality or feature, and shall provide consultation, technical cooperation and other technical assistance reasonably requested by Xylan to incorporate the new functionality or feature into the Xylan Products. Check Point shall be entitled to the fee specified in Section 5(a) (if any is specified for the particular time period) for any assistance Check Point provides to Xylan in incorporating the new functionality or feature, but shall not be entitled to any fee for any pre-incorporation evaluation or feasibility study which Check Point may conduct

(h)     Within a commercially reasonable time after satisfactory completion of the Acceptance Tests, Xylan agrees for the remaining term of this Agreement: (i) to port and embed the Modified Authentication Module and include the VLAN authentication functionality in all current and future versions of the Xylan Products manufactured; (ii) to ship the Modified Inspection Module automatically with each Xylan Product either (a) as embedded within the Xylan Product or (b) as bundled with the Xylan Product; and (iii) to include a Check Point marketing flyer (provided by Check Point and subject to approval by Xylan, which approval shall not be unreasonably withheld) in every Xylan documentation package for Xylan Products shipped under a Xylan label. In addition, Xylan may, in its sole discretion, ship the Modified Inspection Module as an upgrade to Xylan Products shipped before Xylan's obligation under Section 1(h)(ii) becomes effective.

(i)     Except for the rights granted expressly in this Agreement, Check Point or its licensors shall have and retain all right, title and interest in the Check Point Software and any enhancements or modifications made to the Check Point Software, including, but not limited to, all copyright, patent, know-how, trade secret and other intellectual property rights therein. Notwithstanding the foregoing, Xylan shall have and retain its rights, title and interest in inventions arising out of the VLAN authentication development effort and conceived by Xylan personnel. In the event of a joint invention relating to VLAN authentication, the parties shall create a patent committee that shall evaluate the invention and cooperate for the purpose of filing patent applications, as appropriate, and resolving issues of inventorship, ownership, licensing and prosecution fees, but in no event shall either party be entitled to less than the non-exclusive license granted under Section 2(f). Xylan or its licensors shall have and retain all right, title and interest in the Xylan Products, including but not limited to, all copyright, patent, know-how, trade secret and other intellectual property rights therein.

2.     Intellectual Property Licenses

Subject to all of the terms and conditions of this Agreement, the parties grant intellectual property licenses as follows:

(a)     Check Point grants to Xylan a non-exclusive, worldwide license to reproduce, market, distribute and grant others the right to use the Modified Modules, only as incorporated into (or, in the case of the Modified Inspection Module, bundled with) the Xylan Products or as an upgrade to the Xylan Products.

GDSVF&H\28068.1

3

Confidential Technical Material

SR01571

(b)    Check Point grants Xylan a royalty-free, non-exclusive, worldwide license to use and modify the Modules and Modified Modules for the sole purpose of incorporating the Modified Modules into Xylan Products.

(c)    Check Point grants Xylan a non-exclusive, worldwide license to market, distribute and grant others the right to use and distribute (as provided below), in object code form only, the Management Consoles (pursuant to a standard Check Point license agreement whose import/export control restrictions are limited only by applicable laws and regulations). Notwithstanding the above, Xylan may only grant Xylan Partners (as defined below) the right to distribute the Check Point Software which Xylan has a right to distribute, then Xylan shall ensure that any such Xylan Partner agrees to the applicable restrictions and limitations contained in this Agreement.

(d)    Check Point grants Xylan a royalty-free, non-exclusive, worldwide license to use and modify the Authentication Library API for the sole purpose of modifying the Xylan Products to interoperate with the Authentication Library, provided that Xylan shall obtain prior approval of Check Point before modifying the Authentication Library API, which approval shall not be unreasonably withheld.

(e)    Check Point grants Xylan a royalty-free, non-exclusive, worldwide license to use the NAT Single Function API for the sole purpose of modifying the Xylan Products to interoperate with the NAT Module.

(f)    Each party grants the other party a royalty-free, non-exclusive, non-transferable worldwide license to make, use and sell any invention relating to VLAN Authentication which is conceived by either party, whether solely or jointly with the other party, on or between May 23, 1996 and the date of termination or expiration of this Agreement.

(g)    Xylan shall have the right to sublicense its rights with respect to the reproduction, marketing, distribution and granting others the right to use the Modified Modules to all of Xylan's present and future partners, channels and OEM's (collectively, "Xylan Partners"), but only when such Modified Module is embedded in or solely for use with such Xylan Partner's versions of the Xylan Products. With Check Point's prior written consent (which shall not be unreasonably withheld), Xylan shall have the right to sublicense its rights with respect to the marketing and distribution of the Management Consoles to any of Xylan Partners to whom Xylan sublicenses rights in the Modified Inspection Module pursuant to the preceding sentence. Notwithstanding the above, Xylan is not permitted in any way to sublicense or distribute any source code to any Module, Modified Module or Management Console. Xylan shall be responsible (i) for the payment to Check Point of all amounts payable with respect to the Modified Modules and Management Consoles that are distributed by any Xylan Partner pursuant to such a sublicense and (ii) for ensuring that each Xylan Partner to which such a sublicense is granted executes an agreement containing provisions that protect Check Point's rights and interests in Check Point Software that are at least as protective of Check Point as those limitations, disclaimers and restrictions contained herein. Check Point and its licensors shall be named as third party beneficiaries of such agreements with the right to enforce them. Xylan will

4

GDSVF&H\28068.1

use commercially reasonable efforts to ensure that Xylan Partners abide by the terms of such agreements and, upon request by Check Point, will keep Check Point apprised of its activities to enforce such terms with particular Xylan Partners. The parties agree that Check Point may, at its option, include the Modified Modules and the Management Consoles (as modified) on its price list, distribute the Modified Modules and the Management Consoles (as modified) through its own channels or, alternatively, license such items through the Xylan Partners directly. If Check Point does develop a direct relationship with a Xylan Partner, Xylan shall not be responsible for payments due from such Xylan Partners.

        (h)     Subject to the terms and conditions of this Agreement, Xylan grants to Check Point a royalty-free, non-exclusive, worldwide license to use the Xylan Products internally and Xylan shall provide Check Point with two working configurations of the current version of each Xylan Product and any necessary maintenance and support in regards to such configurations.

        3.     <u>Support and Training</u>

        (a)     To facilitate Check Point's ability to maintain the Check Point Software, Xylan shall provide Check Point with adequate and timely information about the Xylan Products. In addition, Xylan shall provide, at no cost to Check Point, such Xylan Products as the parties determine are reasonably necessary to enable Check Point to provide support and maintenance.

        (b)     Xylan shall provide all primary maintenance and support services for the Modified Modules which have been distributed by or through Xylan to an end user. Xylan will receive the incoming call and make an initial diagnosis of the problem, specifically determining whether the problem relates to hardware or to the Check Point Software. Xylan will endeavor to correct the problem. If Xylan cannot correct the problem, the designated Xylan support contact or his designated backup will call the designated Check Point support contact, and provide Check Point with sufficient information so that Check Point can reproduce the "bugs" or other problems reported to Xylan. All requests to Check Point for support shall be effected through the parties' respective designated support contact or their respective designated backup.

        (c)     With respect to Modified Modules that are distributed by or through Check Point, Check Point shall be responsible for receiving incoming calls and making an initial diagnosis of the problem, specifically determining whether the problem relates to hardware or to the Check Point Software. Check Point will endeavor to correct the problem. If Check Point cannot correct the problem, the designated Check Point support contact or his designated backup will call the designated Xylan support contact, and provide Xylan with sufficient information so that Xylan can reproduce the "bugs" or other problems reported to Check Point.

        (d)     Check Point shall use commercially reasonable efforts to provide maintenance and support services for Check Point Software directly to (and only to) Xylan's Technical Support Contact. In performing these services for Xylan, Check Point agrees to

GDSVF&H\28068.1

Confidential Technical Material

SR01573

maintain a telephone line answered promptly by a suitably qualified support person(s) during the business hours of 8 a.m. to 8 p.m. EST, Monday through Friday, holidays excepted for the receipt of calls from Xylan requesting reasonable technical assistance in order to assist Xylan with problems that arise with Xylan End Users. In response to such calls, Check Point shall use commercially reasonable efforts to fulfill Xylan's requests. Check Point's efforts shall include endeavoring to answer questions, correcting any "bugs" or other errors pursuant to the process described in Exhibit G, providing an appropriate solution including a "patch," "fix" or "workaround," and periodically issuing corrective updates and "bug fixes" to the underlying Check Point Software which Check Point distributes to its customers as part of its general maintenance release ("General Maintenance Release"). For clarity, maintenance and support of the Check Point Software under this Agreement does not include new functionality except as otherwise agreed in writing by Check Point and Xylan under Section 1(g).

(e)     Additional support terms and conditions for Check Point Software are set forth in Exhibit G.

(f)     Notwithstanding any of the above support and maintenance terms, if Check Point distributes a License Key to an end user who takes possession of such License Key through Check Point or a Check Point authorized reseller other than Xylan, Check Point shall endeavor to obtain the name and business address of each such end user and shall supply Xylan with such information as it obtains. Such end user shall communicate any problems with the Modified Modules to such reseller. If a Check Point authorized reseller cannot correct the problem then it will contact Check Point for support and Check Point will, if it deems necessary, engage Xylan to determine if the problem reported is due to the (i) Module ("Check Point Problem") or (ii) the Xylan Product or modifications necessary for embedding the Module ("Xylan Problem"). If Check Point has engaged Xylan, then Xylan shall provide support to Check Point, under substantially the same terms, obligations and response times as Check Point is obligated to provide under Exhibit G, as if Xylan were the party providing the Support Services therein. If there is a Check Point Problem, Check Point will be responsible for responding and fixing the problem. If there is a Xylan Problem, then Xylan will notify Check Point and name a Xylan support contact to be provided to the end user.

(g)     Xylan and Check Point will jointly work to build a program to share their "bug" databases and will use reasonable efforts to develop a process for implementing and distributing software upgrades as they become available.

(h)     Xylan agrees to have a reasonable number of people trained and "Check Point Certified" in order to adequately support Xylan's distribution channels. Xylan will be entitled to one day of technical and marketing level training classes at no charge, to occur at Xylan's facilities in Calabasas, California and to be conducted by Check Point. The parties shall agree in writing in advance on the scheduled dates and locations for such training. Check Point will offer to Xylan additional training through authorized third party training facilities at Xylan's expense. A list of Check Point's authorized third party training facilities and related training terms and conditions are set forth in Exhibit D hereto.

6

GDSVF&H\28068.1

Confidential Technical Material

4.   Demonstration and Evaluation

(a)     Subject to all the terms and conditions of this Agreement, Check Point grants to Xylan a royalty-free, non-transferable, non-sublicenseable license to use the Check Point Software in object code form internally solely for the purposes of testing, debugging, supporting, marketing and demonstrating the functions and features pursuant to demonstration licenses. For such purpose, Check Point shall provide Xylan with up to 8 copies of the Enterprise Management Consoles and up to 25 copies of the Inspection Module at no cost. Xylan shall maintain all such copies in confidence in accordance with the terms of this Agreement. Check Point shall also provide Xylan, at no cost, with 1 copy of the Enterprise Security Center (includes one unlimited Firewall Module, one Enterprise Management Console, one Connect Control Module and one Encryption Module) in object code form for Xylan's internal use pursuant to Check Point's standard end user license agreement.

(b)     Subject to all the terms and conditions of this Agreement, Check Point grants to Xylan a royalty-free license to distribute Evaluation Kits (as defined below). For such purpose, Check Point shall use reasonable efforts to provide Xylan with Evaluation Kits in such number as Xylan shall reasonably request, at Check Point's cost, which cost is currently estimated at $40.00 per copy, FOB Check Point's designated shipping point in the United States. Xylan's distribution of such Evaluation Kits shall not be subject to any fee set forth Exhibit H of this Agreement.

(c)     Subject to all the terms and conditions of this Agreement, Check Point grants to Xylan a royalty-free, non-exclusive worldwide license to use and modify documentation supplied to Xylan by Check Point relating to the Check Point Software, except for computer code, for the purposes of marketing and demonstrating the functions and features of Check Point Software, provided that (i) the documentation shall prominently grant attribution to Check Point and shall include applicable proprietary notices, (ii) the documentation shall not include any information designated by Check Point as confidential, and (iii) Check Point shall have the opportunity to pre-approve any modifications (which approval shall not be unreasonably withheld) and request immediate corrections to any inaccurate information.

5.   Compensation and Fees

(a)     Xylan will pay Check Point a non-recurring engineering (NRE) fee for assistance with porting and embedding the current versions of Modules into the Xylan Products of $6,000.00 at the execution of this Agreement. In addition, to the extent that Check Point expends more than 120 man-hours in effecting such port and rendering such assistance, Xylan shall pay Check Point additional NRE at a rate of $100.00 per hour, such amounts to be paid by Xylan to Check Point within 30 days after the date of Check Point's invoice therefor. Until December 31, 1997, Xylan shall pay Check Point additional NRE at a rate of $100.00 per hour, under the same payment terms, for Check Point's assistance with porting and embedding future versions of the Inspection Module and new features or functions that work in conjunction with the Inspection Module provided to Xylan under Section 1(g). After 1997, Check Point may increase the NRE rate according to Check Point's standard rates for such services.

7

Confidential Technical Material

SR01575

(b)     Xylan agrees to pay the fee for the Check Point Software licenses as specified in this Section 5 or Exhibit I, whichever is applicable.

(c)     No later than 21 days after the end of each calendar quarter, Xylan shall issue to Check Point a report with respect to Check Point Software during such calendar quarter that includes in reasonable detail (i) a summary of the performance for such quarter and (ii) a summary of revenue paid by Xylan with respect to such quarter that is identified, by Xylan's best effort approximation, to one of the following regional groups (A) North America; (B) Europe; (C) Middle East, Japan and the Pacific Rim; or (D) the rest of the world.

(d)     Xylan shall reimburse Check Point for reasonable travel, lodging and related expenses incurred by Check Point with respect to the engineering services described herein.

(e)     Except as expressly set forth herein, each party shall bear its own expenses in connection with the transactions contemplated herein.

6.    Reseller Terms

(a)     Xylan is free to determine its own prices for the Xylan Products. Check Point's Price List may show suggested end user prices but such prices are suggestions only. No employee or representative of Check Point has any authority to dictate to Xylan or Xylan Partners the prices for Check Point Software, or in any way to inhibit their pricing discretion with respect to such software.

(b)     Xylan shall forecast expected demand for Check Point Software on an on-going basis. Xylan may order a reasonable number of License Certificates for the Check Point Software to hold in inventory provided such order is based upon forecasted demand. All such Check Point Software shall be held on consignment for Check Point. Within 15 days following the end of each month, Xylan shall provide Check Point with a purchase order setting forth the number of License Certificates distributed during the preceding month. Check Point will deliver invoices to Xylan calculated in United States dollars that set out the charges and expenses incurred during the preceding month. Xylan shall remit all amounts due under such invoices within 45 days of receipt of such invoices. Any late payments shall bear interest at the rate of 1.5% per month or the maximum rate legally permitted, whichever is lower.

(c)     All stated prices are exclusive of any taxes (other than taxes based on Check Point's net income), fees and duties or other amounts, however designated, including value added and withholding taxes which are levied or based upon such charges, or upon this Agreement. Any taxes related to Check Point Software acquired by Xylan pursuant to this Agreement shall be paid by Xylan or Xylan shall present an exemption certificate acceptable to the taxing authorities.

(d)     All orders provided herein shall include a requested delivery date within the term of this Agreement. All orders are subject to written acceptance by an officer of Check Point; provided, however, that Check Point shall treat orders from Xylan at least as

8

GDSVF&H\28068 1

Confidential Technical Material                    SR01576

favorably as orders from other Check Point resellers for the purpose of determining their acceptability. Orders may be placed by fax, with immediate hard copy follow-up.

(e)     Check Point will deliver Evaluation Kits FOB point of shipment. An estimated delivery date will be set forth in Check Point's acceptance of each order. Check Point will make reasonable efforts to meet the estimated delivery date but shall not be liable for any failure to deliver for causes beyond its control. In the absence of specific written instructions, Check Point will arrange for shipment by appropriate transportation, but the carrier shall not be deemed an agent of Check Point nor shall Check Point assume any liability regarding shipment, including any risk of loss or damage to the Evaluation Kits. All shipping and in-transit insurance costs shall be borne by Xylan.

(f)     Xylan will maintain an adequate sales organization for the purpose of fulfilling its obligations under this Agreement. Xylan will appoint an employee knowledgeable in Xylan's activities with respect to the Check Point Software to act as liaison between Check Point and Xylan.

(g)     Xylan shall at all times use its best commercial efforts to promote the sale of the Check Point Software consistent with good business ethics and in a manner which will reflect favorably on the good will and reputation of Check Point. Xylan shall at all times refrain from engaging in any illegal, unfair or deceptive trade practices, whether with respect to the Check Point Software or otherwise.

(h)     Upon Xylan's request, Check Point will furnish to Xylan at its then prevailing charges, such marketing, promotional or other sales materials as Check Point may create and deem useful to assist Xylan in its marketing efforts with respect to the Check Point Software; however the fees for such materials shall not exceed the fees charged to other resellers for the same or similar materials.

(i)     Check Point will endeavor to enhance the acceptance of the Check Point Software, to provide software that meets market needs, and to respond to Xylan's reasonable requests for additional features and support consistent with Check Point's overall commercial objectives and development priorities.

7.    Direct Relationships With Xylan Partners

Check Point shall and hereby does extend an offer, irrevocable for a period of one year from the Effective Date, to Xylan Partners to enter an OEM agreement for the marketing and distribution of Check Point Software whose material pricing and compensation terms and conditions, except for those terms dictating the discounts (which shall be negotiated between Check Point and the Xylan Partner), are substantially equivalent to the pricing and compensation terms and conditions provided in Exhibit H of this Agreement.

9

Confidential Technical Material

SR01577

8.    Supplying Products to Xylan End Users

(a)    A complete firewall solution consists of an Enterprise Management Console plus a Modified Inspection Module. A complete virtual local area network authentication system consists of the Authentication Management Console plus a Modified Authentication Module. "License Certificates" uniquely identify the authorized purchase of a Management Console or Modified Module license. License Certificates are used in the generation of "License Keys" which provide a software-based licensing control mechanism and prevent unauthorized software duplication and use.

(b)    The Enterprise Management Console provides the user interface for configuring and managing the Modified Inspection Module and for administering Modified Inspection Module licensing. Neither the Enterprise Management Console nor the Modified Inspection Modules can be activated without a valid License Key. In addition, in order to enable any Modified Inspection Modules, an Enterprise Management Console must be first activated. The License Key enables the user to operate the Enterprise Management Console and enables a single Modified Inspection Module of an equivalent Level or below.

(c)    The Authentication Management Console provides the user interface for configuring and managing the Modified Authentication Module and for administering Modified Authentication Module licensing. Although the Modified Authentication Module is enabled when it is distributed to the user, management and functional use of the Modified Authentication Module requires the Authentication Management Console. The Authentication Management Console cannot be activated without a valid License Key.

(d)    Check Point administers the generation and distribution of License Keys. To obtain the appropriate License Keys, Xylan or a Xylan End User shall contact Check Point directly, through e-mail, fax or World Wide Web, supplying a host identification number, a Management Console License Certificate identification number(s) and a Module License Certificate identification number(s). In response, within 48 hours Check Point agrees to supply Xylan or the Xylan End User, at no charge, with appropriate License Keys to activate the valid software on the particular machine uniquely identified by the host identification number.

(e)    Check Point shall also make available to Xylan for distribution to Xylan End Users and Xylan Partners Management Console Evaluation Kits in object code format ("Evaluation Kits") which will allow Xylan End Users to evaluate the Check Point Software. Each Evaluation Kit will allow a Xylan End User to configure and manage any number of Modified Modules of any class for a period of 30 days. After 30 days the software is rendered inoperative automatically. All Management Console Certificate/Key distribution procedures described above shall apply to Evaluation Kits.

(f)    Xylan acknowledges that Check Point may distribute License Certificates through its own channels (for activation of the Modified Inspection Module) to end users which have lawfully obtained a Xylan Product. Furthermore, Check Point may sell support services to such end users for the Modified Inspection Modules embedded in the Xylan Products.

10

GDSVF&H\28068 1

Confidential Technical Material                                                      SR01578

9.    <u>Joint Marketing and Promotion</u>  Xylan and Check Point will work together to define and implement a marketing plan that is focused on encouraging customers to purchase Xylan Products capable of using the Modified Modules and to activate the Modified Modules.  It is expected that joint marketing activities will include:  press/analysts positioning, speaking opportunities, trade show activities, seminar programs and direct marketing campaigns.  Check Point shall, in its sole discretion and at no cost to Xylan, provide the Xylan sales and marketing force with such assistance as may be reasonably requested relating to pre-sale customer support for the Check Point Software.

10.    <u>Confidentiality</u>  The parties agree that information they obtain from the other party which is designated confidential is the confidential property of the disclosing party and its licensors ("Proprietary Information").  Except as expressly and unambiguously allowed herein, the parties will hold in confidence and not use or disclose any of the other party's Proprietary Information and shall similarly bind their employees in writing.  The receiving party's nondisclosure obligation shall not apply to information it can document is generally available to the public (other than through breach of this Agreement).

11.    <u>Limited Liability</u>  NOTWITHSTANDING ANYTHING ELSE IN THIS AGREEMENT OR OTHERWISE, NEITHER PARTY WILL BE LIABLE WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY (I) FOR ANY AMOUNTS IN EXCESS IN THE AGGREGATE OF THE FEES PAID TO CHECK POINT FOR CHECK POINT SOFTWARE SUBJECT TO A CLAIM OR CAUSE OF ACTION DURING THE TWELVE MONTH PERIOD PRIOR TO THE DATE THE CLAIM OR CAUSE OF ACTION AROSE OR (II) FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES OR LOST DATA OR (III) FOR COST OF PROCUREMENT OF SUBSTITUTE GOODS, TECHNOLOGY OR SERVICES.

12.    <u>Relationship of Parties</u>

(a)    The parties hereto expressly understand and agree that they are independent contractors in the performance of each and every part of this Agreement, and that each party is solely responsible for all of its employees and agents and its labor costs and expenses arising in connection therewith and is responsible for and will indemnify the other party from any and all claims, liabilities, damages, debts, settlements, costs, attorneys' fees, expenses and liabilities of any type whatsoever that may arise on account of the activities of its employees or agents (including, without limitation, Xylan Partners), including without limitation, providing unauthorized representations or warranties (or failing to effectively disclaim all warranties and liabilities on behalf of Check Point) to its customers or breaching any term, representation or warranty of this Agreement.

(b)    Check Point is in no manner associated with or otherwise connected with the actual performance of this Agreement on the part of Xylan, nor with Xylan's employment of other persons or incurring of other expenses.  Except as expressly provided

11

GDSVF&H\28068.1

Confidential Technical Material

SR01579

herein, Check Point shall have no right to exercise any control whatsoever over the activities or operations of Xylan.

13.    Trademarks and Advertising

(a)    Each party shall have the right to use the trademarks and service marks in relation to its performance under this Agreement, but only as provided below. Each party shall have the right to feature or otherwise mention the other's products in advertising or literature, if and only if the other party has first had a reasonable opportunity to review and has approved in writing the particular advertising or literature and the use of such marks, which approval shall be in the sole discretion of the approving party but shall not be unreasonably withheld.

(b)    Other than the Modified Modules, Xylan shall distribute Check Point Software solely under Check Point's trademarks, trade names, service marks and/or trade dress (the "Trademarks"). The documentation relating to the Xylan Products which incorporate the Modified Modules, any start-up screen and "about" screen relating such products, if applicable, and the media for the Modified Modules, shall prominently grant attribution to Check Point and shall include Check Point's proprietary notices. In connection with the use of Check Point's Trademarks, Xylan shall comply with the quality control guidelines that Check Point may from time to time provide to Xylan, and shall permit Check Point to inspect samples or products and other materials bearing such Trademarks upon request. In addition, if at any time Check Point determines that Xylan's use of the Check Point Trademarks (or the quality of the items bearing such Trademarks) does not comply with Check Point's quality control guidelines as then in effect, Xylan shall make reasonable efforts to promptly modify such use to conform with such guidelines. If Xylan fails to comply with such guidelines within 30 days of receipt of Check Point's notice, Check Point may suspend Xylan's right to use such Trademarks until (in the reasonable judgment of Check Point) Xylan is in full compliance with such guidelines.

14.    Assignment This Agreement and the rights hereunder are not transferable or assignable without the prior written consent of the parties hereto, except (i) rights to payment may be assigned and (ii) either party may assign the Agreement to a person or entity who acquires all or substantially all of the assets or business of a party, whether by sale, merger or otherwise. The licenses provided hereunder are not sublicensable except as expressly and unambiguously authorized in this Agreement.

15.    Term and Termination. Unless terminated earlier as provided herein, this Agreement shall have a term of two (2) years commencing as of the Effective Date and shall thereafter automatically renew for one (1) year terms unless either party provides notice that it does not want to renew 120 days prior to the end of the current term.

(a)    This Agreement may be terminated by a party for cause immediately upon the occurrence of any of the following events:

(1)    If the other ceases to do business, or otherwise terminates its business operations, except that a party shall be deemed to remain in business if it is

GDSVF&H\28068 1

12

succeeded by person or entity which acquires all or substantially all of the assets or business of the party, whether by sale, merger or otherwise; or

(2)    If the other shall fail to promptly secure or renew any license, registration, permit, authorization or approval necessary for the conduct of its business in the manner contemplated by this Agreement, or if any such license, registration, permit, authorization or approval is revoked or suspended and not reinstated within thirty (30) days; or

(3)    If the other materially breaches any material provision of this Agreement and fails to fully cure such breach within 30 days of written notice describing the breach (10 days in the case of a failure to pay and immediately in the case of a breach of Section 10); or

(4)    If the other shall seek protection under any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding, or if any such proceeding is instituted against the other (and not dismissed within 120 days).

(b)    Upon termination of this Agreement by either party or naturally by expiration (i) all licenses hereunder shall terminate, except that end user licenses and any licenses granted under Section 2(f) shall remain in effect, (ii) except as provided herein, the parties will immediately return to the disclosing party all Proprietary Information, catalogues and literature in its possession, custody or control in whichever form held (including all copies or embodiments thereof, (iii) each party will cease using any trademarks, service marks and other designations of the other party and (iv) except as provided herein or elsewhere in this Agreement, the provisions of this Agreement shall remain in effect.

(c)    Notwithstanding the above and provided that Xylan has not breached any confidentiality provisions herein, for three (3) years after termination or expiration of this Agreement, at no charge to Xylan: (i) Xylan shall have the right to retain a copy of the source code for each of the Modified Modules and related documentation; (ii) Check Point grants Xylan the non-exclusive, non-transferable, non-sublicenseable right to use and modify the source code for the Modified Modules, but only for the purpose of "bug fixing" for Xylan End-Users; and (iii) Check Point shall continue to provide support services to Xylan pursuant to the terms of this Agreement. After the initial three (3) year period, Xylan shall be entitled, for up to four additional one year terms, to provide continued support ("Extended Support") for Xylan End-Users to whom Xylan has a continuing obligation by statute, regulation or contract to provide "bug fixing" ("Extended Xylan End-Users"), provided that Xylan, before the beginning of each such one year term, makes a support fee payment to Check Point in the amount of 6.0% of Check Point's standard list price for each Modified Inspection Module licensed to the Extended Xylan End-Users. The terms and conditions of Extended Support are as follows: (i) Xylan shall have the right to retain a copy of the source code of each of the Modified Modules and related documentation; (ii) Check Point grants Xylan the non-exclusive, non-transferable, non-sublicenseable right to use and modify the source code for the Modified Modules, but only for the purpose of "bug fixing" for Xylan End-Users; and (iii) Check Point shall use reasonable efforts to provide software maintenance services to Xylan (but without any obligation to

13

GDSVF&H\28068.1

Confidential Technical Material

maintain compatibility with Check Point's latest, released software) "Bug fixing" shall mean correcting errors in the code of the Modified Modules that prevents them from operating according to specifications in existence on the date of termination or expiration of this Agreement.

(d)     Termination is not the sole remedy under this Agreement and, whether or not termination is effected, all other remedies will remain available.

16.     Indemnity.

(a)     Each party (the "Indemnifying Party") will defend at its own expense any third party action brought against the other party (the "Indemnified Party"), to the extent that the claim is based upon the assertion that any of the Indemnifying Party's product or documentation infringes a third party patent or copyright or violates any trade secret. The Indemnifying Party will pay any costs and damages finally awarded against the Indemnified Party in any such action which are attributable to such claims, including any reasonable attorney's fees and expenses. A party shall have no liability to the other under this provision with respect to any claim of infringement with respect to a product to the extent that it is based upon (i) the combination of any such product with any machine, device, firmware or software not furnished by such party, (ii) any product not sold or licensed by such party or (iii) any modification of such party's product by another party. Each party's obligations under this provision are subject to the conditions that: (i) the Indemnified Party promptly notifies the Indemnifying Party in writing of any such claim and (ii) the Indemnified Party agrees that the Indemnifying Party will have sole control of such defense and all negotiations for any settlement or compromise. The Indemnified Party will permit the Indemnifying Party to attempt to cure any infringement or violation within a reasonable time by (i) procuring the right for the Indemnified Party to use the technology, (ii) modifying the materials so that they are no longer infringing or in violation of such trade secret while retaining at least equivalent functionality, or (iii) replacing the affected products with products of at least equivalent functionality.

17.     Warranty Disclaimer.  EXCEPT FOR THE WARRANTY MADE DIRECTLY TO END USERS IN EXHIBIT E (AS MODIFIED BY THE NEXT SENTENCE), CHECK POINT MAKES NO WARRANTIES TO ANY PERSON WITH RESPECT TO THE CHECK POINT SOFTWARE OR ANY SERVICES OR LICENSES AND DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. XYLAN WILL HANDLE AND BE RESPONSIBLE FOR ALL WARRANTY RETURNS OF XYLAN PRODUCTS FROM ITS DIRECT AND INDIRECT END USERS AND XYLAN PARTNERS.

18.     General.

(a)     Amendment and Waiver-Except as otherwise expressly provided herein, any provision of this Agreement may be amended and the observance of any provision of this Agreement may be waived (either generally or in any particular instance and either retroactively or prospectively) only with the written consent of the parties. However, it is the

14

Confidential Technical Material

SR01582

intention of the parties that this Agreement be controlling over additional or different terms of any purchase order, confirmation, invoice or similar document, even if accepted in writing by both parties, and that waivers and amendments shall be effective only if made by non-pre-printed agreements clearly understood by both parties to be an amendment or waiver.

       (b)    Governing Law and Legal Actions - This Agreement shall be governed by and construed under the laws of the State of California and the United States without regard to conflicts of laws provisions thereof and without regard to the United Nations Convention on Contracts for the International Sale of Goods. In any action or proceeding to enforce rights under this Agreement, the prevailing party shall be entitled to recover costs and attorneys' fees.

       (c)    Headings - Headings and captions are for convenience only and are not to be used in the interpretation of this Agreement.

       (d)    Notices - Notices under this Agreement shall be sufficient only if personally delivered, delivered by a major commercial rapid delivery courier service, mailed by certified or registered mail, return receipt requested or mailed by first class mail to a party at its addresses first set forth herein or as amended by notice pursuant to this subsection. If first class mail is used, notice shall be deemed received 5 days after deposit in the U.S. mails with sufficient postage.

       (e)    Entire Agreement - This Agreement supersedes all proposals, oral or written, all negotiations, conversations, or discussions between or among parties relating to the subject matter of this Agreement and all or industry custom. In addition, notwithstanding anything to the contrary, any references herein to the sale of Check Point Software shall refer only to licenses to use such software and shall not mean a sale of such software (including copies thereof).

       (f)    Severability - If any provision of this Agreement is held to be illegal or unenforceable, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.

15

Confidential Technical Material

SR01583

IN WITNESS HEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

XYLAN CORPORATION:

By _____

Name _Yuri Pikover_____

Title _VP, Sales_____

Date _2/14/97_____

CHECK POINT SOFTWARE TECHNOLOGIES, LTD.:

By _____

Name _Gil Shwed_____

Title _President and CEO_____

Date _March 3, 1997_____

16

Confidential Technical Material

SR01584

Exhibit A:  Specifications of Check Point Software and Xylan Products

Exhibit B:  Statement of Work and Schedule

Exhibit C:  Acceptance Tests

Exhibit D:  Check Point Training Facilities

Exhibit E:  End User License Agreement

Exhibit F:  Trademarks

Exhibit G:  Support Services Agreement

Exhibit H:  Pricing Structure

GDSVF&H28068.1

Confidential Technical Material

SR01585

2/7/97 Revision

## EXHIBIT A

### CHECK POINT SOFTWARE AND XYLAN PRODUCTS

1.    Check Point Software

The following describes the various modules, consoles and functionality which will be modified, as necessary, for use in conjunction with the Xylan Products.

Check Point Software as provided to Xylan includes the following licensed products:
- Inspection Module
- Authentication Module
- Enterprise Management Console
- Authentication Management Console

Below is a more complete description of each software product. Comprehensive descriptions of each function may be found in the FireWall-1 end-user documentation with the exception of the VLAN Authentication functions.

A.    Modified Inspection Module

The Inspection Module includes all software which is to be modified and incorporated in the Xylan Products. The Modified Inspection Module consists of the following software modules:

*INSPECT Virtual Machine:* provides core access control functions and is used by other software processes such as NAT.

*FireWall Daemon Module:* provides management and auditing functions.

*Authentication Module:* includes a Transparent Session Authentication Daemon, Client Authentication Daemon and the Authentication Library; provides Transparent Session Authentication and Client Authentication.

*NAT Module:* includes software required to perform network address translation. Provided to Xylan with the NAT Module is the NAT Single Function API which allows Xylan software to use the NAT module to perform source address translation.

B.    Modified Authentication Module

The Modified Authentication Module includes a modified Client Authentication Daemon and the Authentication Library. Provided with the Authentication Library is the Authentication Library API which allows Xylan software to integrate with and make use of the Authentication Library to perform VLAN Authentication.

GDSVF&H28068.1                              A-1

C.    Authentication Management Console

There are three licensable versions of the Authentication Management Console which Xylan has the right to redistribute:
- Starter - limited to controlling one Xylan Product
- Site - limited to controlling 5 Xylan Products
- Enterprise - unlimited number of Xylan products supported

Each version of the Authentication Management Console supports the following functions:
- define users in the authentication database
- define the passwords or authentication scheme to applied to each user
- define VLAN authorizations for each user
- support for authentication using S/KEY
- support for authentication using FireWall-1 passwords
- proxy to a remote Security Dynamics Ace/Server for user authentication (support for VLAN Authentication using the Ace/Server is beyond the scope of work)
- proxy to a remote Assure Net Pathways Defender Security Server for user authentication (support for VLAN Authentication using the Defender Security Server is beyond the scope of work)
- proxy to a remote server supporting a compatible version of RADIUS for user authentication

D.    Enterprise Management Console

The Enterprise Management Console is capable of managing all aspects of the Modified Inspection Module and Modified Authentication Module (including all features described as part of the Authentication Management Console). FireWall-1 end-user documentation provides a complete overview of the features and functions provided by the Enterprise Management Console.

2.    Xylan Products

"Xylan Products" as used in this Agreement refers exclusively to the PizzaSwitch and OmniSwitch products.

Confidential Technical Material

SR01587

2/7/97 Revision

## EXHIBIT B

### STATEMENT OF WORK

The following tasks are required to complete the work laid out in the Agreement. The work will be completed in two primary phases:

Phase 1
- Port and embed the Inspect Virtual Machine and FireWall Daemon components of the Inspection Module
- Modify the Enterprise Management Console to support Modules embedded in Xylan Products including Authentication Module

Phase 2
- Port and embed the Modified Authentication Module (modified Client Authentication Daemon & Authentication Library) into Xylan Products
- Port and embed NAT Module into Xylan Products
- Port and embed the Authentication Module (Transparent Session Authentication Daemon and Client Authentication Daemon) into Xylan Products
- Build a derivative of the Enterprise Management Console which supports the Authentication Module exclusively (Authentication Management Console)
- Support for Stage 2 VLAN Authentication work done by Xylan

Phase 1 Work

Modified Inspection Module

Two software modules, the Inspect Virtual Machine and the FireWall Daemon, are the first modules to be ported to the Xylan Product environment (VxWorks). The Enterprise Management Console work is accomplished in the same time frame to facilitate Beta and Acceptance Testing. The scope of work includes:
- Port and embed the Inspect Virtual Machine and the FireWall Daemon
- Integrate firewall functionality with VLANs

Milestones:
- First Integration - November 1996
- Beta - February 1997
- GA - March 1997

Enterprise Management Console

The Enterprise Management Console is a standard Check Point product. The modifications required to support Inspection Modules embedded in Xylan Products are limited in scope.

GDSVF&H22861.2|
GDSVF&H28068.1                    B-1

The scope of work includes:
- Create and build icons to represent Xylan Product-based Inspection Modules
- Extension of the User Database to support configuration of VLAN fields per user

Milestones:
- First Integration - January 1997
- Beta - February 1997
- GA - March 1997

Phase 2 Work

Modified Authentication Module

Xylan would like to distribute an authenticated VLAN access solution in two stages. The first stage will be part of the Phase 1 work.
Stage 1 - Telnet Client Authentication
This form of authentication would be derived from the existing Client Authentication and would be limited to clients with Telnet capability. It is assumed that the client will be assigned an IP address prior to authentication.
The scope of work includes:
1. Porting a modified Client Authentication Daemon to the Xylan environment (Xylan lead effort with Check Point assistance)
2. Complete protocol for communication between the Daemon/Authentication Library and the Authentication Server (Check Point)
3. Include VLAN fields in the Check Point user interface for configuring users (user database). (Check Point)
4. Xylan to document what information needs to be passed to the Switch in order to authorize a user for a given VLAN(s); the list of attributes may include VLANs, time until re-authentication required, number of sessions permitted before re-authentication required.
5. Xylan to define a default VLAN mechanism whereby only the specified Telnet port may be accessed on the switch. After the client is authenticated and authorized to belong to specific VLANs, then the client will be placed in these VLANs and allowed to communicate over the network according to the VLAN and Firewall policies.

Milestones:
- First Integration - January 1996
- Beta - March 1997
- GA - June 1997

Stage 2 - This authentication scheme would extend the Stage 1 scheme using a Xylan developed Daemon to handle a MAC-level authentication protocol between the Xylan Products and the Client.
The scope of work includes:

Confidential Technical Material                                    SR01589

1.  Providing documentation of the Check Point Authentication Library residing on the Switch (Check Point effort).
2.  Xylan to write both a MAC-level client and a MAC-level daemon to handle the authentication protocol between the client and the Xylan Products.

Milestones:
*   Check Point to provide Authentication Library API documentation – January 15th, 1997

NAT Module

Xylan would like to be able to call a specific function to handle address translation of the source address. Xylan wants to use NAT to allow a remote connection to a network to be translated such that the user appears to belong to a local IP subnet-based VLAN.
The scope of work includes:
*   Port and embed NAT module in Xylan Products
*   Check Point to provide Xylan with NAT Single Function API

Milestones:
*   First Integration – March 1997
*   Beta - April 1997
*   GA - June 1997

Modified Authentication Module

This project involves porting the software daemons which use the Authentication Library to form a complete Authentication module which supports general purpose authentication.
The scope of work includes:
*   Port and embed Transparent Session Authentication Daemon in Xylan Products
*   Port and embed Client Authentication Daemon in Xylan Products

Milestones:
*   First Integration – March 1997
*   Beta - April 1997
*   GA - June 1997

Authentication Management Console

The Authentication Management Console is a subset of the functionality of the Enterprise Management Console.
The scope of work includes:
*   Define and build a derivative of the Enterprise Management Console which provides the functionality required of the Authentication Management Console.
*   Add support for the required license keys into the Check Point License Server.
*   Build a new installation routine.

Confidential Technical Material                                           SR01590

Milestones:
- First Integration Completion Target: March 1997
- Beta Testing Target: April 1997
- GA: June 1997

Confidential Technical Material                                        SR01591

2/7/97 Revision

<u>EXHIBIT C</u>

ACCEPTANCE TESTS

1.    <u>Introduction</u>

This document is an extraction for the Test Software Engineering Document. It will present the Acceptance plan implemented for the Modified Inspection Module and the Enterprise Management Console. Also, this document assumes that the reader is aware that Check Point produces software that deals with security, and therefore, the QA is security oriented at a high level.

The Limitation of the QA is related to the environment where the product evolves. It is clear that Check Point will not be able to test all the hardware available on the market, like network cards, or software options for the target platform, etc. On the other hand, Check Point is responsible to test Check Point Software on all the platforms Check Point declares to support, and on the main hardware available on the market.

2.    <u>Definitions</u>

(a)    Remark

A remark could be an anomaly, a Request for enhancement, a general question.

(1)    Levels for a Remark

a)    **Blocking**

Prevent the product from working in a live environment

b)    **Major**

Serious problem, yet, this problem does not imply, direct, immediate, implication

c)    **Minor**

Otherwise

3.    <u>List of tests</u>

(a)    Documentation Verification

Verification that the documentation includes all the new features, release note, and appropiate changes

Confidential Technical Material

SR01592

(b)    Fire wall 1 version section

Verification that the version presented is compatible with the Check Point version's policy

(c)    Upgrade release tests

Upgrade tests from different previous version, to the new one presented

(d)    Stress tests

Stress tests is performed via Special tools, found on the INTERNET, as shareware to test firewalls or special internal programs developed by Check Point to put the FireWall under High Stress. The stress is put on the level the operability of the software as well as on the number of connections handled by the FireWall. It also depends on how is configured the Firewall.

(e)    Durability tests

These tests are made to make sure that the Modified Inspection Module is stable in time. Simulation of all types of connections in different environment are made for long periods with special logs and analyze during this period. Only those features which are implemented in a specific release of the Modified Inspection Module will be tested.

(f)    Function Tests

GUI tests
Features test
Installation and licensing
Authentication
        - Client authentication
        - Transparent Session authentication
Address translation
New services support

4.    Tools Used

The following is a description of the tools that the QA uses to perform the tests.

| TOOL | USED TO |
|---|---|
| Mercury Winrunner , Xrunner | gui tests<br>basic operation of the features |
| bug tracking system | connection with the R&D<br>tracking bugs for relevant versions |
| sniffer | Network Address Translation<br>Connections through the firewall |

GDSVF&H\28068 1

SR01593

| Network Tools | Simulating Network Traffic, Stress tests, Durability tests |
|---|---|
| Batch tools | Test Network, stress test, any |
| ShareWare | many shareware happen to be on the market with designed features to test FireWall, we retrieve them and use them on our FireWall. |

5.   Acceptance definition for a release

(a)   Release Acceptance

No release will be able to go out without a complete test in the QA labs of Check Point and Xylan.

(b)   Patch Acceptance

When the QA receives a patch for a version, to verify. A detailed list of possible regression is given with the patch among the list of all the features changed by the patch. A focused QA of the product is then performed, related to the changes made + a basic test of the product is made as well. The basic test is here to make sure that the basic requirements of the Modified Inspection Module are working.

(c)   Sub-release Acceptance

Same like Patch Acceptance, since a sub-release is a list of patches. If anything which is not a patch would have to be implemented in a sub-release, then a complete test of the areas covered by this change will be performed.

6.   General

Out of all the test mentioned before, a release of the Modified Inspection Module or the Enterprise Management Console is ONLY accepted by the QA Dept. if there is no existing remark of level BLOCKING or level MAJOR, unless otherwise agreed in writing by both parties.

A release note will be edited for all remarks of level MINOR and a planning will be proposed for each one of them.

GDSVF&H28068.1

Confidential Technical Material

SR01594

2/7/97 Revision

## EXHIBIT D

### CHECK POINT AUTHORIZED TRAINING CENTERS

Check Point works with two professional training organizations. These organizations currently offer advanced FireWall-1 training courses. A brief summary of each is provided below for reference purposes. Please contact the respective organizations for additional information.

Netrex, Inc.
3000 Town Center, Suite 1100
Southfield, MI 48075
810-352-9643
800-3-NETREX
FAX: 810-352-2375

**Check Point and Advanced FireWall-1 Training Course**
Length: 2 days
Tuition: $2,500

Please contact Netrex for course dates and locations.

Protocol Interface, Inc.
171 Carlos Drive
San Rafael, CA 94903
415-491-8950
FAX: 415-491-8955
email: register@picom.com

Training Centers:
San Francisco
New York
Dallas

**Integrated Network Security with FireWall-1**
Length: 2 days
Tuition: $2,500

Please contact Protocol Interface for course dates and locations.

D-1

Confidential Technical Material

SR01595

2/7/97 Revision

<u>EXHIBIT E</u>

End User Agreement

SOFTWARE RIGHT-TO-USE LICENSE AGREEMENT

This is the Software License Agreement ("SLA") is between "You" and Check Point Software Technologies Ltd. ("Check Point") of 35 Jabotinsky St., Ramat-Gan, Israel.

THIS PRODUCT CONTAINS CERTAIN COMPUTER PROGRAMS AND OTHER PROPRIETARY MATERIAL, THE USE OF WHICH IS SUBJECT TO THIS END USER SOFTWARE LICENSE AGREEMENT. OPENING THE SEALED ENVELOPE CONSTITUTES YOUR AND YOUR FIRM'S ASSENT TO AND ACCEPTANCE OF THIS END USER SOFTWARE LICENSE AGREEMENT. IF YOU DO NOT AGREE WITH ALL THE TERMS, YOU MUST RETURN THIS PRODUCT (WITH THE ENVELOPE STILL SEALED), ALL MANUALS AND DOCUMENTATION, AND PROOF OF PAYMENT, TO THE PLACE YOU OBTAINED THEM FOR A FULL REFUND WITHIN 30 DAYS OF FIRST ACQUIRING THIS PRODUCT. WRITTEN APPROVAL IS NOT A PREREQUISITE TO THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT AND NO SOLICITATION OF ANY SUCH WRITTEN APPROVAL BY OR ON BEHALF OF COMPANY SHALL BE CONSTRUED AS AN INFERENCE TO THE CONTRARY. IF YOU HAVE ORDERED THIS PRODUCT, THE COMPANY'S ACCEPTANCE IS EXPRESSLY CONDITIONAL ON YOUR ASSENT TO THESE TERMS TO THE EXCLUSION OF ALL OTHER; IF THESE TERMS ARE CONSIDERED AN OFFER BY CHECK POINT, ACCEPTANCE IS EXPRESSLY LIMITED TO THESE TERMS.

Definitions:

"Product" means the software program, original electronic media and all accompanying manuals and other documentation related to the FireWall-1™ product, together with all enhancements, upgrades, and extensions thereto that may be provided by Check Point to You from time to time.

"Licensed Configuration" means the choice of software tools and features, and the maximum number of concurrent users and the installation of the software, as declared by You in your purchase order, or request for Password, and upon which the licensing fee was based.

"Licensed-server" means the single CPU (defined by the host ID declared to Check Point) which is used to administer license tokens to enable the Product to operate in accordance with the Licensed Configuration.

"Password" means the code provided to You by Check Point which enables the Product to operate on the Licensed-server and administer tokens for the specified Licensed Configuration.

F-1

Confidential Technical Material

License:

     1.     Check Point hereby grants, to You and only You, a non-exclusive, non-sublicensable, non-transferable license only to use the object code of the Product subject to the terms and conditions of this SLA. You have no right to receive, use or examine any source code or design documentation relating to the Product.

     2.     This license permits the use of the Licensed Configuration of the Product by You. Such authorized use is controlled by the Password, which enables the Licensed-server to administer license tokens in accordance with the Licensed Configuration. If your Licensed-server is disabled, Check Point may, at its sole discretion, issue You another Password which will enable You to operate this Product on a substitute Licensed-server. In this event, You agree not to use the original Licensed-server nor its Password.

     3.     You may not copy the software. You may not make any copies of any documentation associated with the Product, in whole or in part.

     4.     The License is valid only for a period of 30 days from the delivery of the Product, and is designed to allow You to evaluate the Product during such period in order to determine whether or not You wish to enter into a longer-term license agreement with Check Point. In the event that You determine to enter into a longer-term license agreement with Check Point, Check Point will assign You a Password that will allow utilization of the Product following the initial 30-day period, and all of the terms and conditions of this Software Right-to-use SLA will continue to apply throughout the license period. In the event that You do not determine to enter into a licensing transaction with Check Point by the end of the evaluation period specified above, or that Check Point advises You that discussions with respect to a licensing transaction have terminated, Your rights under this SLA shall terminate, You shall promptly return the Product to Check Point, You shall promptly destroy any derivative material relating to the Product, and You shall not retain or use any such material in any form or for any reason.

Maintenance and Support:

     1.     Check Point has no obligation to provide support or maintenance or upgrades, modifications or new releases under this SLA.

Title, Protection of Intellectual Property, Termination:

     1.     The Product is protected under international copyright, trademark and trade secret and patent laws. This license is not a sale. All right, title, and interest to the Product shall remain with Check Point. The license granted herein does not constitute a sale of the Product or any portion or copy of it. A copy of the product is provided to You only to allow You to exercise your rights under the license. The Product is licensed to You for your internal use

GDSVF&H28068.1

and the Product or any derivative or by-product of the Product may not be used by, sub-licensed, re-sold, rented, or distributed to any other party. You may not assign your rights under this SLA without the prior written consent of Check Point.

2.    You acknowledge that the source code of the Product, and the concepts and ideas incorporated by this Product, are valuable intellectual property of Check Point. You agree not to copy the Product, nor to distribute any such concepts or ideas to any third party, or to attempt (or permit others) to decipher, reverse translate, de-compile, disassemble or create derivative works based on the Product or any part thereof, or to develop methods to enable unauthorized parties to use the Product, or to develop any other product containing any of the concepts and ideas contained in the Product. Trademarks may be used only to identify printed output produced by the Product. The provisions of this paragraph shall survive the termination of this SLA.

3.    You agree that Check Point may terminate this SLA at any time without prior notice in the case of your breach of any of the provisions hereof. Upon termination of this SLA, You agree to cease all use of the Product and to destroy the Product and all documentation and related materials in your possession, and to certify their destruction. Except for the license granted herein and as expressly provided herein, the terms of this SLA shall survive termination.

4.    Check Point shall have the right, but not the obligation, to defend or settle, at its option, any action at law against You arising from a claim that your permitted use of the Product under this SLA infringes any patent, copyright, or other ownership rights of a third party. You agree not to remove any Product identification, copyright or other notices. You also agree not to allow others to use the Product to, or for the benefit of, third parties. You agree to provide to Check Point written notice of any such claim within ten (10) days of your notice thereof and provide reasonable assistance in its defense. Check Point has sole discretion and control over such defense and all negotiations for a settlement or compromise, unless it declines to defend or settle, in which case You are free to pursue any alternative You may have. THE FOREGOING IS IN LIEU OF ANY WARRANTIES OF NONINFRINGEMENT, WHICH ARE HEREBY DISCLAIMED. The foregoing obligation of Check Point does not apply with respect to Product or portions or components thereof (i) not supplied by Check Point, (ii) which are modified after shipment by Check Point, if the alleged infringement relates to such modification, (iii) combined with other products, processes or materials where the alleged infringement relates to such combination, (iv) where You continue allegedly infringing activity after being notified thereof or after being informed of modifications that would have avoided the alleged infringement, or (v) where Your use of the Product is incident to an infringement not resulting primarily from the Product or is not strictly in accordance with the License.

Limited Warranty and Limitation of Liability:

1.    Check Point warrants that the encoding of the software program on the media on which the product is furnished will be free from defects in material and workmanship, and that the Product shall substantially conform to its user's manual, as it exists at the date of delivery, for a period of ninety (90) days from the date You receive the original Password.

GDSVF&H\28068.1

Check Point's entire liability and your exclusive remedy shall be, at Check Point's option, either (a) return of the price paid for this license, resulting in termination of this SLA or (b) repair or replacement of the Product or media that does not meet this Limited Warranty.

2.    EXCEPT FOR THE LIMITED WARRANTIES SET FORTH IN THE PRECEDING PARAGRAPH, THIS PRODUCT IS PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESSED OR IMPLIED. CHECK POINT DOES NOT WARRANT THAT THE PRODUCT WILL MEET YOUR REQUIREMENTS OR THAT ITS OPERATION WILL BE UNINTERRUPTED OR ERROR FREE. CHECK POINT DISCLAIMS ANY IMPLIED WARRANTIES OR MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. Some states or provinces do not allow the exclusion of implied warranties or limitations on how long an implied warranty may last, so the above limitations may not apply to You. This warranty gives You specific legal rights. You may have other rights which vary from state to state.

3.    IN NO EVENT WILL CHECK POINT BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY DAMAGES ARISING OUT OF THIS SLA OR THE USE OF THE PRODUCT, INCLUDING LOST PROFITS OR SAVINGS, WHETHER ACTUAL, INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL, IRRESPECTIVE OF WHETHER CHECK POINT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. CHECK POINT'S MAXIMUM LIABILITY FOR DAMAGES SHALL BE LIMITED TO THE LICENSE FEES RECEIVED BY CHECK POINT UNDER THIS LICENSE FOR THE PARTICULAR PRODUCT(S) WHICH CAUSED THE DAMAGES. Some states or provides do not allow the exclusion or limitation of incidental or consequential damages, so the above limitation or exclusion may not apply to You.

Export Control:

The product is subject to the export control laws of the United States and of Israel. None of this software or the underlying information or technology may be downloaded or otherwise exported from the United States or Israel in any manner. In addition, the Product may not be sold to (1) or into Cuba, Haiti, Iraq, Libya, Yugoslavia, North Korea, Iran, Or Syria, or to a national or resident of those countries, or (2) anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the US Commerce Department's Table of Deny Orders. By accepting this license, You are agreeing to the foregoing and warranting that You are not located in, under the control of, or a national or resident of any such country or on any such list.

GDSVF&H\28068.1

Confidential Technical Material

SR01599

General:

      1.     The SLA contains the complete agreement between You and Check Point, and cannot be varied by any statements or representations made by any other party. If any provision of this SLA is held to be invalid or unenforceable by a court of competent jurisdiction, the remainder of the provisions of this SLA shall remain in full force and effect.

      2.     United States federal law shall govern all patent, copyright, and trademark issues arising under or relating to this Agreement. The interpretation of this SLA shall be governed by the laws of the State of California, without giving effect to the conflict of laws principles thereof. All disputes arising under or relating to this SLA shall be resolved exclusively in the appropriate United States federal court or California State court sitting in San Francisco, California. This SLA will not be governed by the United Nations Convention on Contracts for the International Sales of Goods, the application of which is expressly excluded. This SLA sets forth the entire understanding and agreement between You and Check Point and may be amended only in writing signed by both parties.

      3.     You agree that the Product will not be shipped, transferred, or exported into any country or used in any manner prohibited by the law.

U.S. Government Restricted Rights: This provision applies to Products acquired directly or indirectly by or on behalf of the United States Government. The Product is a commercial product, licensed on the open market at market prices, and was developed entirely at private expense and without the use of any U.S. Government funds. Should You have any questions concerning this SLA contact the Manufacturer at Check Point, 35 Jabotinsky St., Ramat-Gan, Israel.

GDSVF&H\28068.1

Confidential Technical Material

## EXHIBIT F

## TRADEMARKS

The company name should be typeset with CHECK POINT ™ in small caps, capital C and P, and character spacing set at 0.4 as shown below:

CHECK POINT™ Software Technologies, Inc.

The product name should be typeset with CHECK POINT ™ in small caps, *FireWall-1*™ in italics, and capital F and W, as shown below:

CHECK POINT™ *FireWall-1*™

CHECK POINT™, the CHECK POINT™ logo, and CHECK POINT™ *FireWall-1*™ are trademarks of CHECK POINT™ Software Technologies, Inc.

Consistency is key to the image of all marketing materials. The status of each logo and how the company and product names should be communicated. These may change due to image update, legal trademarks and registrations.

Confidential Technical Material                                                        SR01601

EXHIBIT G

SUPPORT SERVICES AGREEMENT

SUPPORT SERVICES TERMS AND CONDITIONS


This Exhibit G relates to and is incorporated into the Agreement. Capitalized terms not defined in Section 8 below have the same meaning as in the Agreement. Except as otherwise set forth in the Agreement, in this Exhibit G, Xylan shall be referred to as "Reseller" and the Management Consoles and the Modified Modules shall be referred to as "Product".

1.    COVERAGE

Subject to the terms hereof, Check Point will provide Support Services to Reseller for the Product.

2.    SUPPORT SERVICES

Support Services consist of (a) Error Correction and Telephone Support provided to the Technical Support Contact concerning the installation and use of the then current release of Product and (b) Product updates that Check Point in its discretion makes generally available. Product updates consist of one copy of published revisions to the printed documentation and one copy of revisions to the machine readable Product which are not designated by Check Point as products for which it charges a separate fee.

3.    TERM AND TERMINATION

Support Services shall be provided for one year from the termination date of the 90 day warranty provided under the Agreement.

Check Point may suspend or cancel Support Services if Reseller fails to make payment pursuant to the Section titled "Fees and Payment," or breaches the Support Services provisions and such breach is not remedied within thirty (30) days (10 days in the case of nonpayment) after Reseller receives notice of the breach.

Confidential Technical Material                    SR01602

4.   <u>FEES AND PAYMENT</u>

For each unit of Product for which Support Services will be provided, Reseller shall pay Check Point the applicable Support Services fee as listed in the then-current Check Point price list.  Support Services fees will be billed on an annual basis, payable in advance.  Reseller shall be responsible for all taxes associated with Support Services other than U.S. taxes based on Check Point's net income. Reseller's payment is due within thirty (30) days of receipt of the Check Point invoice.  In the event Reseller fails to pay Check Point on the due date, then to reinstate or renew Support Services (if allowed by Check Point), Reseller must first pay Check Point the annual Support Services fee and the reinstatement charge listed in the then-current Check Point price list.

5.   <u>ERROR PRIORITY LEVELS</u>

Check Point shall exercise commercially reasonable efforts to correct any Error reported by Reseller in the current unmodified release of Product in accordance with the priority level reasonably assigned to such Error by Check Point.

a)   Priority A Errors -

Check Point shall promptly commence the following procedures:

1.   assign Check Point engineers to correct the Error;

2.   notify Check Point management that such Errors have been reported and of steps being taken to correct such Error(s);

3.   provide Reseller with periodic reports on the status of the corrections; and

4.   initiate work to provide Reseller with a Workaround or Fix.

b)   Priority B Errors -

Check Point shall exercise commercially reasonable efforts to include the Fix for the Error in the next regular Product maintenance release.

c)   Priority C Errors -

Check Point may include the Fix for the Error in the next major release of the Product.

Confidential Technical Material                                    SR01603

If Check Point believes that a problem reported by Reseller may not be due to an Error in the Product, Check Point will so notify Reseller. At that time, Reseller may (1) instruct Check Point to proceed with problem determination at its possible expense as set forth below or (2) instruct Check Point that Reseller does not wish the problem pursued at its possible expense. If Reseller requests that Check Point proceed with problem determination at its possible expense and Check Point determines that the error was not due to an Error in the Product, Reseller shall pay Check Point, at Check Point's then-current and standard consulting rates, for all work performed in connection with such determination, plus reasonable related expenses incurred therewith. Reseller shall not be liable for (i) problem determination or repair to the extent problems are due to Errors in the Product or (ii) work performed under this paragraph in excess of its instructions or (iii) work performed after Reseller has notified Check Point that it no longer wishes work on the problem determination to be continued at its possible expense (such notice shall be deemed given when actually received by Check Point). If Reseller instructs Check Point that it does not wish the problem pursued at its possible expense or if such determination requires effort in excess of Reseller's instructions, Check Point may, at its sole discretion, elect not to investigate the error with no liability therefor.

6.  ## EXCLUSIONS

Check Point shall have no obligation to support:

1)  altered, damaged or modified Product or any portion of the Product incorporated with or into other software;

2)  Product that is not the then current release or immediately Previous Sequential Release;

3)  Product problems caused by Reseller's negligence, abuse or misapplication, use of Product other than as specified in the Check Point's user manual or other causes beyond the control of Check Point; or

4)  Product installed on any Computer Hardware that is not supported by Check Point.

Check Point shall have no liability for any changes in Reseller's hardware which may be necessary to use Product due to a Workaround or maintenance release.

7.  ## LIMITATION OF LIABILITY

Check Point's liability for damages from any cause of action whatsoever relating to Check Point's agreement to provide support services shall be limited to the

Confidential Technical Material                                        SR01604

amount paid by Reseller for the Support Services for the applicable year. Check Point's liability shall be further limited as provided in the Agreement.

8.    DEFINITIONS

Unless defined otherwise herein, capitalized terms used in these Support Services Terms and Conditions shall have the same meaning as set forth in the Agreement.

"Error" means an error in Product which significantly degrades the Product as compared to the Check Point's published performance specifications.

"Error Correction" means the use of reasonable commercial efforts to correct Errors.

"Fix" means the repair or replacement of object or executable code versions of Product to remedy an Error.

"Previous Sequential Release" means the release of Product which has been replaced by a subsequent release of the same Product. Notwithstanding anything else, a Previous Sequential Release will be supported by Check Point only for a period of six (6) months after release of the subsequent release.

"Priority A Error" means an Error which renders Product inoperative or causes the Product to fail catastrophically.

"Priority B Error" means an Error which substantially degrades the performance of Product or materially restricts Reseller's use of the Product.

"Priority C Error" means an Error which causes only a minor impact on the Reseller's use of Product.

"Support Services" means Check Point support services as described in Section 2.

"Telephone Support" means technical support telephone assistance provided by Check Point to the Technical Support Contact during normal business hours concerning the installation and use of the then current release of Product and the Previous Sequential Release.

"Workaround" means a change in the procedures followed or data supplied by Reseller to avoid an Error without substantially impairing Reseller's use of Product.

9.    THESE TERMS AND CONDITIONS CONSTITUTE A SERVICE CONTRACT AND NOT A PRODUCT WARRANTY. THE PRODUCT AND ALL MATERIALS RELATED TO THE PRODUCT ARE SUBJECT EXCLUSIVELY

GDSVF&H\28068.1                    H-4

TO THE WARRANTIES SET FORTH IN THE PRODUCT LICENSE AGREEMENT. THIS ATTACHMENT IS AN ADDITIONAL PART OF THE AGREEMENT AND DOES NOT CHANGE OR SUPERSEDE ANY TERM OF THE AGREEMENT EXCEPT TO THE EXTENT UNAMBIGUOUSLY CONTRARY THERETO.

10. In the event any term or condition of this Exhibit G conflicts with any term or condition of the Agreement, the Agreement shall control and the term or condition of this Exhibit G shall have no force or effect whatsoever.

GDSVF&H\28068.1

H-5

Confidential Technical Material

SR01606

## EXHIBIT H

### PRICING STRUCTURE

## CHECKPOINT SOFTWARE

### Enterprise Management Console

Xylan shall pay Check Point 50% of the then-current list price for each Enterprise Management Console distributed by Xylan. List prices are published by Check Point from time to time on its generally available price list ("Check Point Price List"). The current list price for the Enterprise Management Console $11,995.00.

### Authentication Management Console

Xylan shall pay Check Point 38% of the list price stated below for each Authentication Management Console and for each upgrade from the Authentication Management Console to the Enterprise Management Console distributed by Xylan. Check Point reserves the right to modify the Authentication Management Console List Prices after providing Xylan with thirty (30) days prior written notice.

| Product | List Price | Upgrade to Enterprise Management Console (List Price) |
| --- | --- | --- |
| Authentication Management Console (limited to controlling 1 switch) | $1995 | $10,995 |
| Authentication Management Console (limited to controlling 5 switches) | $4995 | $7695 |
| Authentication Management Console (unlimited # of switches) | $9995 | $2195 |

### Modified Inspection Module

Xylan shall pay Check Point for License Certificates distributed by Xylan for Modified Inspection Modules. Xylan shall not pay Check Point for License Certificates distributed through Check Point channels for Modified Inspection Modules. The price of each Modified Inspection Module license distributed by Xylan is determined by the designated Platform upon which the Modified Inspection Module resides and the number of authorized nodes as set forth below. Following is the current Check Point List Prices as applied to the Inspection Module and the Xylan Products:

GDSVF&H\28068.1                          6

The discount for the Modified Inspection Module shall be 75% off of the Recommended List Prices specified below. However, in consideration of the development and initial marketing effort being invested by Xylan, Check Point agrees to grant Xylan an additional 2.5% discount, for a total discount of 77.5%, effective until 9/6/97.

| Xylan Platform | Inspection Module | Recommended List Price |
|---|---|---|
| Any platform | Inspection Module/25 Nodes | $995 |
| Any platform | Inspection Module/50 Nodes | $1,995 |
| PizzaSwitch | Inspection Module/Unlimited Nodes | $3,495 |
| OmniSwitch 5 | Inspection Module/Unlimited Nodes | $4,995 |
| OmniSwitch 9 | Inspection Module/Unlimited Nodes | $4,995 |

### Modified Authentication Module

Xylan has no obligation to pay Check Point for Modified Authentication Modules distributed during the term of this Agreement.

### Future Target Platforms

Xylan shall pay for Check Point Software incorporated with any target platform not addressed in this Agreement ("New Target Platform"). There are three different levels of pricing for the activated Check Point Modules ("Levels"). The price of each Module sold to Xylan ("Module Cost") is a function of the average list price of a typical New Target Platform configuration ("Average Price of New Target Platform"). Once the parties determine the Module Cost for the New Target Platform, it should be set forth in writing as an attachment to this Exhibit H. The following is a list of the Levels, and Module Cost as a function of the Published List Price of the New Target Platform:

| Module Level | Module Cost | Average Price of New Target Platform (as determined by Xylan) |
|---|---|---|
| Small | $1,995 | less than $5,000 |
| Medium | $3,495 | $5,000 to $12,000 |
| Large | $4,995 | over $12,000 |

Confidential Technical Material                    SR01608

## SUPPORT FEES

### Enterprise Management Console and Authentication Management Console

With respect to support and maintenance of the Enterprise Management Console and the Authentication Management Console, Xylan shall receive a discount of 60% off the support and maintenance price listed on the then-current Check Point Price List. The current list price for support and maintenance of the Enterprise Management Console is $2395.

### Modified Inspection Module

With respect to support and maintenance of the Modified Inspection Modules, Check Point shall calculate the total revenue received from Xylan for the distribution of Module Licenses Certificates in a quarter ("Total Revenue Received"). Xylan shall then pay Check Point, within thirty (30) days after the end of such quarter, ten percent (10%) of the Total Revenue Received.

### Modified Authentication Module

During the term of the Agreement, Xylan shall not be obligated to pay to Check Point any fees for support and maintenance of the Modified Authentication Module.

Confidential Technical Material                                                   SR01609

| Attorney or Party without Attorney:<br>ORRICK, HERRINGTON & SUTCLIFFE, LLP<br>1000 MARSH ROAD<br>Menlo Park, CA 94025<br>Telephone No: 650-614-7400       FAX No: 650-614-7401 | | | | | For Court Use Only |
|---|---|---|---|---|---|
| Attorney for: Defendant | | Ref. No. or File No.:<br>15903-8 | | | |
| Insert name of Court, and Judicial District and Branch Court:<br>United States District Court, Northern District Of California | | | | | |
| Plaintiff: ALCATEL USA RESOURCES, INC.; ET AL<br>Defendant: FOUNDRY NETWORKS, INC. | | | | | |
| **PROOF OF SERVICE**<br>**SUBPOENA IN A CIVIL** | Hearing Date:<br>Mon, Oct. 16, 2006 | Time:<br>9:00AM | Dept/Div: | Case Number:<br>1:05 CV 418 | |

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of the SUBPOENA IN A CIVIL CASE

3. a. Party served:          CHECK POINT SOFTWARE TECHNOLOGIES, INC.
   b. Person served:          PATRICIA KOJIMA, LEGAL COUNSEL, AUTHORIZED TO ACCEPT

4. Address where the party was served:          800 BRIDGE PARKWAY
                                                REDWOOD SHORES, CA 94065

5. I served the party:
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on: Mon., Oct. 02, 2006 (2) at: 3:55PM
   b. I received this subpena for service on:          Monday, October 02, 2006

6. Witness fees were offered or demanded, and paid:          $55.00

7. Person Who Served Papers:                              Recoverable Cost Per CCP 1033.5(a)(4)(B)
   a. JON ROBERTS                                  d.  **The Fee for Service was:**



   A & A LEGAL SERVICE                             e.  I am: (3) registered California process server
                                                       *(i)*   Independent Contractor
   1541 Bayshore Hwy.      GENERAL@AALEGALSERVICE.COM    *(ii)*  Registration No.:     2005-52
   Burlingame, CA 94010-1602      Fax (650) 697-4640     *(iii)* County:               Sacramento
   (650) 697-9431                                        *(iv)*  Expiration Date:       Thu, Nov. 08, 2007

8. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

   Date:Mon, Oct. 02, 2006

Rule 982.9.(a)&(b) Rev July 1, 2004      PROOF OF SERVICE          (JON ROBERTS)
Judicial Council Form                    SUBPOENA IN A CIVIL                                6147400.33290